**FRIENDS OF THE WILD SWAN, INC.; et al., Plaintiffs,**

v.

**U.S. FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior; et al., Defendants.**

Civil No. 94–1318–JO.

United States District Court,
D. Oregon.

Dec. 4, 1997.

Gary Keith Kahn, Reeves Kahn & Eder, Portland, OR, Jack R. Tuholske, Missoula, MT, for Plaintiffs.

Kristine Olson, U.S. Attorney, District of Oregon, Thomas C. Lee, Asst. U.S. Attorney, U.S. Attorney's Office, Portland, OR, Warigia M. Bowman, U.S. Department of Justice, Wildlife & Marine Resources Section, Washington, D.C., Scott W. Horngren, Haglund & Kirtley, Portland, OR, Bruce M. Smith, Rosholt Robertson & Tucker, Boise, ID, for Defendants, Amicus, and Intervenor–Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

This case has been before this court several times in plaintiffs' efforts to give the bull trout the maximum protection available under the federal Endangered Species Act (ESA). As allowed under that Act and the U.S. Fish and Wildlife Service's (USFWS's) regulations,[1] plaintiffs originally petitioned USFWS to list the bull trout as an endangered species on October 27, 1992. They also requested emergency listings for certain bull trout populations. Eventually, USFWS issued its 1994 WARRANTED; BUT PRECLUDED ADMINISTRATIVE 12–MONTH FINDING ON A PETITION TO LIST THE BULL TROUT UNDER THE ENDANGERED SPECIES ACT (June 6, 1994) (hereinafter ORIGINAL 1994 FINDING), concluding that listing of that species in the coterminus United States was warranted but precluded. ORIGINAL 1994 FINDING 26. Plaintiffs filed this suit to challenge that determination, arguing that the "warranted but precluded" finding for the bull trout was arbitrary and capricious.

The bull trout was never listed. On June 12, 1995, USFWS issued its new 12–month finding for the bull trout, as the ESA requires. 12–MONTH RECYCLED PETITION FINDING FOR A PETITION TO LIST THE BULL TROUT AS THREATENED OR ENDANGERED, 60 Fed.Reg. 30825, 30825 (June 12, 1995) (hereinafter 1995 FINDING). USFWS again concluded that listing of the bull trout was warranted but precluded. *Id.*

On June 22, 1995, this court issued an order declaring plaintiffs' challenge to the ORIGINAL 1994 FINDING moot because of the 1995 FINDING and instructing plaintiffs to amend their complaint to challenge the 1995 FINDING, if they so desired. Plaintiffs declined to amend their complaint and appealed to the Ninth Circuit. The Ninth Circuit found that plaintiffs' challenge "falls within the exception to the mootness doctrine for claims that are capable of repetition yet evading review." *Friends of Wild Swan v. U.S. Fish & Wildlife Serv.,* No. 95–35916, 81 F.3d 168, 1998 WL 155143, at 6 (9th Cir. April 2, 1996). Accordingly, the Ninth Circuit remanded the case to this court.

On remand, this court determined that USFWS had been arbitrary and capricious in its ORIGINAL 1994 FINDING and remanded that determination to the agency. *Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.,* 945 F.Supp. 1388, 1401–02 (D.Or.1996). In compliance with this court's order, USFWS revisited the ORIGINAL 1994 FINDING and on March 11, 1997, it issued its reconsidered 12–MONTH FINDING ON A PETITION TO LIST THE BULL TROUT (hereinafter the REVISED 1994 FINDING). In accordance with its findings in the REVISED 1994 FINDING, on June 17, 1997, USFWS issued a proposed regulation to list certain population segments of the bull trout for protection under the ESA. PROPOSAL TO LIST THE KLAMATH RIVER POPULATION SEGMENT OF BULL TROUT AS AN ENDANGERED SPECIES AND COLUMBIA RIVER POPULATION SEGMENT OF BULL TROUT AS A THREATENED SPECIES, 62 Fed.Reg. 32268, 32268 (June 13, 1997) (hereinafter the proposed rule).

In the proposed rule, USFWS used the 1994 record to find that five distinct population segments of bull trout exist: "(1) Coastal/Puget Sound; (2) Klamath River; (3) Co-

---

1. 50 C.F.R. § 424.14.

lumbia River; (4) Jarbridge River; and (5) Saskatchewan River." 62 Fed.Reg. at 32269. USFWS further determined that listing was not warranted for the Coastal/Puget Sound, Jarbridge River, and Saskatchewan River populations. *Id.* However, it has proposed listing of the Klamath River population segment as an endangered species and the Columbia River population segment as a threatened species. *Id.* at 32268.

This case is now before us on the parties' cross motions (# 176, # 190) regarding USFWS's decisions to make listing decisions solely for five distinct population segments and to not propose the Coastal/Puget Sound, Jarbridge River, and Saskatchewan River population segments for listing pursuant to the ESA. For the reasons discussed below, I GRANT plaintiffs' motion in part and DENY it in part, GRANT defendant's motion in part and DENY it in part, and remand the REVISED 1994 FINDING to USFWS for the limited purposes of: (1) explicitly considering whether listing of the bull trout is warranted throughout the species' range; (2) considering whether listing of the bull trout is warranted within the coterminous United States *or* explaining why USFWS no longer considers the coterminous United States a proper population on which listing decisions can be based; and (3) reconsideration of whether listing of the Coastal/Puget Sound population segment is warranted. This opinion is not intended to interrupt, nor should it be interpreted as disrupting, the ongoing listing process for the Klamath River population segment and the Columbia River population segment.

## ADMINISTRATIVE FINDINGS

### A. THE REVISED 1994 FINDING

#### 1. Bull Trout Species as a Whole and Listing Factors

The bull trout (*Salvelinus confluentus*) is a large freshwater char that is native to Washington, Oregon, Idaho, Montana and Nevada, as well as Canada and Alaska. In its REVISED 1994 FINDING, USFWS noted that bull trout populations "exhibit four distinct life history forms: resident, fluvial, adfluvial, and anadromous." *Id.* at 3. Moreover, these "[d]iverse life history strategies

are important to the stability and vitality of bull trout populations ***." *Id.* In particular:

Extensive migrations are characteristic of the species ***. Migratory bull trout facilitate the interchange of genetic material between populations, ensuring sufficient variability within populations. Migratory forms also provide a mechanism for restoring local populations extirpated due to natural or human-caused events ***. Migratory forms are more fecund and larger than non-native brook trout, potentially reducing the risks associated with hybridization ***. The greater fecundity of these larger bull trout also enhances the ability of a population to persist in the presence of introduced fishes ***. Migratory bull trout have been restricted and/or eliminated due to stream habitat alterations, including seasonal or permanent obstructions, detrimental changes in water quality, increased temperatures, and the alteration of natural stream flow patterns. Migratory corridors tie seasonal habitat together for anadromous, adfluvial, and fluvial forms, and allow for dispersal of resident forms for recolonization of rebounding habitats. The disruption of migratory corridors, if severe enough, will result in the loss of migratory life history types and isolate resident forms from interacting with the metapopulation ***.

*Id.* at 4. In addition:

Bull trout display a high degree of sensitivity at all life stages to environmental disturbance and have more specific habitat requirements than many other salmonids ***. Bull trout growth, survival, and long-term population persistence appear to be particularly dependent upon five habitat characteristics: 1) Cover, 2) channel stability, 3) substrate composition, 4) temperature, and 5) migratory corridors ***.

*Id.* at 3.

In the REVISED 1994 FINDING, USFWS reviewed each of the five listing factors set forth in the ESA for the bull trout species throughout its range. Habitat degradation was particularly significant. Thus, USFWS noted that "only 18 percent of all bull trout populations and stream segments rangewide are not threatened by degraded habitat con-

ditions" and that "[a]dverse impacts to bull trout habitat and populations due to land management practices have been documented throughout the species' range in the coterminous United States ***." *Id.* at 25. Moreover, USFWS noted that it is "likely" that the bull trout populations in "managed" drainages are at risk of extinction. *Id.* In addition, dams have affected bull trout habitat and "[m]any migratory bull trout populations associated with mainstem river systems have been extirpated due to the construction of dams, particularly in the Columbia Basin ***." *Id.* Dams also isolate bull trout populations, and "[c]onnectivity within and between watersheds is essential for maintaining aquatic ecosystem functions *** and healthy bull trout populations ***." *Id.* Finally, agriculture, grazing and mining have all adversely affected the bull trout.

As to other factors, USFWS noted that "[f]orty-two percent of all populations across the range were considered suppressed due to accessibility and overharvest," *id.* at 31, and that "illegal poaching of bull trout continues and especially threatens small populations." *Id.* Although disease is not believed to threaten the bull trout population, "[p]redation on juvenile bull trout by non-native fish species, such as lake, brown, and brook trout is a recent and potentially serious threat to many populations ***." *Id.* at 33. Existing regulatory mechanisms are inadequate to protect the bull trout; "[i]mplementation of Federal and State laws designed to conserve fish resources or maintain water quality has been inadequate to prevent past and ongoing habitat degradation and population fragmentation." *Id.* at 34. Finally, "[i]solation, competition, predation and hybridization with introduced species adversely impact the persistence and viability of bull trout populations." *Id.* at 36.

Despite this examination of factors for the whole species, USFWS never considered whether the entire species warranted listing under the ESA. Instead, USFWS identified five significant and distinct population segments and made its listing decisions only with regard to those five subpopulations. "This approach was undertaken because bull trout occur in widespread but fragmented

habitats and have several life history patterns. In addition, the threats to the fish are diverse, and the quantity and quality of information regarding the population status and trends of bull trout varies greatly." *Id.* at 5.

According to USFWS, "[a] distinct population segment is a discrete group of vertebrates significant to the species as a whole." *Id.* Discreteness means that the population is isolated from other members of the species, *id.*, whereas "significance was determined by the importance and/or contribution of a discrete population to the species throughout its range. The three criteria used were whether: 1) the discrete population occurs in a unique or unusual ecological setting, 2) the overall range of the taxon [2] would be significantly reduced if the discrete population were lost, and/or 3) the genetic characteristics of the discrete population are substantially different from other populations." *Id.* at 6.

USFWS found that "numerous bull trout populations are isolated from each other because of unsuitable habitat and/or impassible dams and diversions" and that "these isolated populations could be considered discrete ***." *Id.* Nevertheless, based on the 1994 record, it determined that "few populations of bull trout are significant to the species as a whole," *id.* at 6, 7, and identified only five distinct population segments, as discussed below. *Id.* at 6.

### 2. Coastal/Puget Sound Population Segment

USFWS found the Coastal/Puget Sound population segment to be discrete "because it is geographically segregated from other populations by the Pacific Ocean and the rest of the Cascade Range." *Id.* at 6. This subpopulation is significant because "it encompasses that only known anadromous forms of bull trout; it occurs in a unique (i.e., marine) ecological setting; and the loss of this population would significantly reduce the overall range of the taxon." *Id.*

Because of lack of data, USFWS's findings for the Coastal/Puget Sound are for native charr, which include both bull trout and dolly

**2.** A taxon is the classification unit at issue, such as the species or genus.

varden, *id.* at 8–9, even though USFWS acknowledges that bull trout and dolly varden are two separate species. *Id.* at 2–3. USFWS found that, overall, "[t]he historic distribution of charr in the Puget Sound and coastal drainages of Washington has remained largely unchanged; population status varies between subbasins, but several strong populations exist \*\*\*." *Id.* at 9. Noting that charr occur in 29 subbasins in this area, USFWS further elaborated that populations in 11 of those subbasins "are either stable, increasing, or secure; population status in the remaining 18 subbasins is unknown." *Id.* Nevertheless, "[p]opulations in the south Puget Sound area are doing poorly relative to other areas of the distinct population segment" and charr populations in the Stilliguamish subbasin that are associated with two degraded spawning areas "are considered to be at high extinction risk." *Id.*

USFWS summarized its conclusions regarding the Coastal/Puget Sound population segment as follows:

Many of the bull trout populations associated with this distinct population segment consist of large-in-size migratory forms (anadromous or adfluvial) with good reproductive potential and high fecundity. The potential for population connectivity and genetic interchange are good within the marine environment for the anadromous forms. The larger reservoirs such as Cushman or Chester Moore offer possibilities for genetic interchange within localized adfluvial forms, but these populations are typically isolated from interacting with anadromous populations. Resident forms are rare, but occur in the headwaters of some drainages.

In summary, native charr (bull trout and dolly varden) are widely distributed and locally abundant in the Coastal/Puget Sound population segment. The record contains indications of population declines in the southernmost subbasins, and evidence of strong localized populations throughout the distinct population segment. Additional data are needed to determine the population status in British Columbia. The record is unclear whether the range of bull trout extends into Alaska. *Id.* at 10.

USFWS also examined this population segment with respect to each of the five ESA factors for listing. Noting that forest management, agriculture, hydropower, mining, and grazing have degraded habitat in the coastal drainages of Washington, it also recognized that "timber harvest activities have suppressed habitats in the Olympic and Mt. Baker–Snoqualmie National Forests, in addition to private and corporate lands surrounding the Puget Sound and Olympic Peninsula," *id.* at 26, and that some creeks "have been severely degraded due to logging." *Id.* Nevertheless, "the trend of this distinct population segment is stable to increasing, based on the 1994 record." *Id.* at 27.

Lack of information and the purported stability of the chart populations in the Puget Sound region made USFWS conclude that none of the other factors were significant, either. For instance, "[b]ecause of the scarcity of data on commercial and recreational harvest, the overutilization of bull trout for commercial recreational, scientific, or educational purposes in the Coastal/Puget Sound population segment is not substantiated in the 1994 record." *Id.* at 31. Similarly, "[t]he 1994 administrative record contains no information suggesting that disease or predation threaten this distinct population segment." *Id.* at 33. Moreover, although poaching is a potential problem and "enforcement of sport fishing laws may be inadequate along the Washington coast and Puget Sound," USFWS concluded that, "given the general stability of bull trout in the Puget Sound and western British Columbia, the 1994 record does not document inadequate existing regulatory mechanisms for the Coastal/Puget Sound population segment ." *Id.* at 34. Finally, USFWS discounted the effect of other factors as follows:

Based on the 1994 record, hybridization or non-native interactions are not a concern in British Columbia. Brook trout occur in western Washington streams primarily in headwater areas above natural and manmade barriers, and are restricted to interacting with resident forms of bull trout.

The larger, migratory forms in this distinct population segment appear to be unaffected by non-native interactions. Because charr anadromy has been maintained in the Coastal/Puget Sound population segment, genetic interchange as a result of stock mixing and straying of individuals alleviates much of the isolation concerns that are prominent in other distinct population segments. Based on the 1994 record, other natural or manmade factors do not affect the continued existence of the Coastal/Puget Sound population segment. *Id.* at 36–37.

In light of these findings, USFWS determined that listing of the Coastal/Puget Sound population segment was not warranted. *Id.* at 38. Noting that "[t]he trend of this distinct population segment is stable to increasing based on the 1994 record," USFWS elaborated that "[e]leven of the 29 subbasin populations in the Puget Sound area are either stable, increasing, or secure." *Id.* Finally, "[a]lthough the status of the remaining 18 subbasins is unknown, the Service considered known documented trends within a distinct population segment to be representative of the entire population segment." *Id.*

### 3. Klamath River Population Segment

The Klamath River population segment is discrete "because of physical isolation from populations elsewhere by the Pacific Ocean and several small mountain ranges in central Oregon." *Id.* at 5. USFWS noted that the Klamath and Columbia River subpopulations are evolutionarily distinct, *id.*, and found that "the Klamath River population segment is significant to the taxon because of substantial genetic differences from the Columbia River populations." *Id.* at 6.

USFWS noted that bull trout in the Klamath Basin had declined from widely distributed diverse forms to being restricted to 10 streams in the basin by 1989. *Id.* at 10. By 1991, studies indicated that "only seven segregated resident populations still occurred in the basin and were confined to headwater streams in the Sprague, Sycan, and Upper Klamath Lake subbasins." *Id.* The Sprague River subbasin has "the healthiest remaining populations in the Klamath population segment"; however, "these populations are con-

sidered to be at a moderate to high risk of extinction ***." *Id.* at 11. Extinction risks are similarly moderate or high in Long Creek, Coyote Creek, and the Upper Klamath Lake. *Id.* As USFWS concluded:

all seven of the remaining populations in the Klamath River Basin are currently disconnected from each other, and are considered to be isolated, remnant groups from a historically larger, more diverse metapopulation. Ratliff and Howell (1992) determined each population to be at a moderate or high risk of extinction. Bull trout occur in three primary subbasins, with the fish residing in the Upper Klamath Lake subbasin the most precarious. The Sprague River and Sycan River subbasins each contain isolated populations where bull trout are relatively abundant within their limited available habitat of 2.5 miles or less. Recent extinctions reportedly have occurred in Coyote Creek and the Upper Sycan River of the Sycan subbasin, and Cherry and Sevenmile Creeks of the Upper Klamath Lake subbasin ***.

*Id.*

With regard to the five ESA factors, habitat degradation has resulted in the loss of the migratory life history forms in the Klamath River basin; moreover, habitat factors "have rendered much of the basin unsuitable habitat for bull trout, and have isolated small resident populations in extreme headwater areas where suitable habitat still exists ***." *Id.* at 27. Therefore, "[b]ased on the 1994 record, the present or threatened destruction, modification, or curtailment of bull trout habitat or range threatens the Klamath River distinct population segment of bull trout." *Id.*

Moreover, USFWS found that hybridization with brook trout is a significant threat to the remaining populations of bull trout in the Klamath River basin. *Id.* at 37. In addition, bull trout in this basin compete with introduced brook and brown trout, and the bull trout suffer because of isolation and restriction of gene flow. *Id.* As a result, USFWS concluded that "[b]ased on the documented hybridization and human-induced isolation described in the 1994 record, other natural or manmade factors do affect the continued ex-

istence of the Klamath River population segment." *Id.*

Nevertheless, "the overutilization of bull trout for commercial, recreational, scientific, or educational purposes does not threaten the Klamath Basin population segment based on the 1994 record." *Id.* at 31. Similarly, "[b]ased on the administrative 1994 record, disease or predation do not threaten the Klamath Basin population segment." *Id.* at 33. Finally, overharvest also is not a continuing problem:

> Although historic harvest in the Klamath River basin likely contributed .to the decline of bull trout, no information is provided in the 1994 record to suggest that harvest, or the inadequacy of environmental rules and regulations now threaten bull trout. Given that legal harvest has been stopped since 1992, the 1994 record does not document inadequate existing regulatory mechanisms for the Klamath River population segment.

*Id.* at 34–35.

Given these findings, USFWS determined that listing of the Klamath River population segment was warranted. *Id.* at 39. However, "the 1994 administrative record is void of information that would lead to the conclusion that emergency protection under the Act is warranted for Klamath River population segment" because "[t]he 1994 record does not indicate that this population segment faces a significant risk to its immediate well-being ***." *Id.* USFWS assigned the Klamath River population segment a listing priority of 3 because it faces high and imminent threats of extinction. *Id.* at 41. It determined that it would incorporate this subpopulation into its Tier 3 listing priorities under the 1997 Priority Guidance. *Id.* at 42.

#### 4. Columbia River Population Segment

The Columbia River population segment "is significant because the overall range of the species would be substantially reduced if this discrete population were lost." *Id.* at 7. However, USFWS also noted that there was no discrete boundary between the upper and lower Columbia River populations. *Id.*

USFWS analyzed the Columbia River population segment on a subbasin-by-subbasin basis. It noted that "[o]f the 99 bull trout populations evaluated in the Kootenai River basin, all were at least at moderate risk of extinction, and 47 percent of these were considered to be at high risk of extinction ***." *Id.* at 12. Similarly, bull trout in Flint and Rock Creeks, Blackfoot River, Bitterroot River, Clark Fork River, Lower Clark Fork River, Flathead River, the North Fork Flathead tributaries, the Middle Fork Flathead tributaries, South Fork Flathead River, Swan Lake, Swan River, Stillwater River, Priest Lake, Upper Priest Lake, Lower Pend Oreille River, Coeur d'Alene subbasin, Spokane River subbasin, Kachess Lake, Keechelus Lake, Roosevelt Lake, Pend Oreille River, Entiat River subbasin, Methow River subbasin, Wenatchee River subbasin, Oregon tributaries of the Snake River, John Day River, Middle Fork John Day River, Umatilla River, Walla Walla River, Hood River, Upper Deschutes River have been reported to face either a moderate or high risk of extinction. *Id.* at 12–22.

Summarizing the status of the Columbia River population segment, USFWS concluded:

> An examination of 386 bull trout populations in the Columbia River population segment indicated that 33 percent are declining, 15 percent stable, 3 percent secure, and 2 percent increasing ***. The population status of the remaining 47 percent is unknown. Of the 386 bull trout populations, 44 percent are considered remnant, 30 percent not remnant, and 26 percent unknown ***. The general trend of bull trout populations in the Columbia River population segment where status is known is declining.

*Id.* at 22.

As for particular factors, "[b]ull trout populations in the Columbia River population segment face a number of threats from habitat degradation and passage problems," *id.* at 28, including high water temperatures, grazing, agriculture, road construction, mining, forest management, and hydroelectrical impoundments. Thus, "[a]lthough bull trout are widely distributed throughout the Columbia River population segment, individual populations are highly fragmented, and most populations are isolated and remnant," *id.* at

29, and "the general trend in this distinct population segment is declining." *Id.* Thus, "[b]ased on the 1994 record, the present or threatened destruction, modification, or curtailment of bull trout habitat or range threatens the Columbia River distinct population segment of bull trout." *Id.* at 30.

Other factors also impair the bull trout's continuing existence. Because "implementation of Federal and State laws designed to conserve fish resources or maintain water quality has been inadequate to prevent past and ongoing habitat degradation and population fragmentation," and given "that the general trend of bull trout populations in this distinct population segment is declining, the 1994 record suggests that existing regulatory mechanisms for the Columbia River distinct population segment are inadequate." *Id.* at 35. Moreover, "non-native introductions seriously threaten bull trout populations" in parts of the Columbia River basin, *id.* at 37, particularly regarding brook trout and lake trout. As a result, "[b]ased on the documented hybridization and competition from introduced brook and lake trout described in the 1994 record, other natural and manmade factors do affect the continued existence of the Columbia River population segment." *Id.* at 38.

Overharvest analysis was more complex for this subpopulation. "Historic harvest in the range of the Columbia River population segment likely contributed to the observed decline of bull trout." *Id.* at 32. However, states have imposed angling restrictions for bull trout, and "because angling restrictions are in place and legal harvest is limited to only a few large populations, the overutilization of bull trout for commercial, recreational, scientific, or educational purposes in the Columbia River population segment is not substantiated in the 1994 record." *Id.* Similarly, "[b]ased on administrative 1994 record, disease does not threaten the Columbia River population segment and the threat posed by predation is limited and not substantiated for the entire population segment." *Id.* at 33.

Overall, "[b]ecause the Service considered known documented trends within a distinct population segment to be representative of the entire population segment, an overall declining trend of bull trout populations in the Columbia River basin was evident based on the 1994 administrative record." *Id.* at 39. In light of USFWS's analysis of the five factors, it concluded that listing of this population segment was warranted. *Id.* However, "the 1994 administrative record does not support the conclusion that emergency protection under the Act is warranted for Columbia River population segment" because "the record lacks information about impending threats that pose an immediate risk to the distinct population segment; documentation that existing regulatory mechanisms are such that bull trout are at immediate risk of extirpation; or depiction of fish populations, except for small isolated groups, so low that the population segment is immediately threatened with extinction." *Id.* at 39–40. USFWS assigned the Columbia River population segment a listing priority of 9 because it faces moderate and imminent threats of extinction. *Id.* at 41. It determined that it would incorporate this subpopulation into its Tier 3 listing priorities under its 1997 Priority Guidance. *Id.* at 42.

## 5. Jarbridge River Population Segment

The Jarbridge River population segment "is discrete and segregated from other Snake River populations because of a large hiatus (greater than 240 river kilometers (150 river miles)) of unsuitable habitat and several impassible dams on the mainstem Snake River." *Id.* at 7. This subpopulation is the southernmost population of bull trout and "are likely the most susceptible to climatic changes and associated global warming." *Id.* In addition, "the loss of this population would result in a substantial modification of the species' range." *Id.*

USFWS's analysis of the Jarbridge River population segment was limited by lack of information. That analysis reported:

An isolated population of bull trout exists in the East and West Forks of the Jarbridge River drainage in Nevada, and represents the southernmost population within the current range of the species. This population has been referred to as a glacial relict, in part because the population consists of low numbers of small resident fish that are believed to have been established

in this system with glacial retreats and gradual climatic change \*\*\*. However, a fluvial form may exist in the Jarbridge River \*\*\*.

The status of the Jarbridge River population is largely unknown, but Johnson (1990) suggested that the species has been rare in this drainage since 1934 when the first bull trout occurrence was documented. Abundance data is spotty, but suggests a stable population. The Nevada Division of Wildlife (NDOW) conducted bull trout population and habitat surveys in 1992–93 and, based on these surveys, suggested that these populations may be at or near potential \*\*\*. Bull trout densities calculated from their sampling efforts ranged from 53 to 370 fish/mile at 7 different locations. It is unclear in the 1994 record whether the populations are fragmented or isolated within or between the East and West Forks of the Jarbridge River. As a result, the actual distribution of the species, extent of isolation, or population status as it relates to interconnectiveness and gene flow cannot be determined.

*Id.* at 23.

As far as particular factors were concerned, although "poor habitat quality was identified as the most limiting factor within the East Fork Jarbridge River and tributaries," "the Jarbridge River populations appear stable." *Id.* at 30. Moreover, "these populations may be at or near potential." *Id.* Thus, "[g]iven the apparent stability of this distinct population segment and the lack of substantial ongoing or potential threats from the Jarbridge River area, the present or threatened destruction, modification, or curtailment of bull trout habitat or range for the Jarbridge River distinct population segment is not substantiated in the 1994 record." *Id.* Similarly, "[g]iven the uncertainty and limited information regarding the effect of recreational harvest on bull trout, the 1994 administrative record fails to substantiate overutilization of bull trout for commercial, recreational, scientific, or educational purposes as a factor that would support listing the Jarbridge River distinct population segment," *id.* at 32, and "[n]o indication of concern about disease or predation resulting from [interrelationships of bull trout and

rainbow trout, mountain white fish, and mountain sucker] can be found in the 1994 administrative record." *Id.* at 33–34.

USFWS tersely summarized the effect of regulatory mechanisms as follows:

The 1994 administrative record discloses no special angling regulations in Nevada to protect bull trout. However, in light of the general stability of bull trout in the Jarbridge River basin, the 1994 record does not document inadequate existing regulatory mechanisms for this distinct population segment.

*Id.* at 35. Similarly, "[n]on-native species introductions are not known to be a threat to bull trout within the Jarbridge River basin. Based on the 1994 record, other natural or manmade factors do not affect the continued existence of the Jarbridge River population segment." *Id.* at 38.

Emphasizing that the trend of the Jarbridge River population was stable to increasing, that the population may have been historically rare, and that the population may be at or near potential, USFWS determined that listing of this population segment was not warranted. *Id.* at 40.

### 6. Saskatchewan River Population Segment

The Saskatchewan River population segment "is discrete because of segregation from other populations by the continental divide \*\*\*." *Id.* at 7. Because this subpopulation "represents the only occurrence of the species east of the Rocky Mountains," it "is significant because its loss would result in a significant reduction in the range of the taxon." *Id.*

As with the Jarbridge River population segment, "little is known about population status and trends." *Id.* at 23. Thus, although "fishery biologists in Alberta believe bull trout populations east of the Continental Divide have suffered relatively large population declines," "no abundance data are presented." *Id.* at 24. "In general, populations in the northern, more remote areas of the province are at little to no risk, while those in the southern, more accessible areas are at higher risk." *Id.*

Information was similarly limited for particular factors. Thus, "[t]he 1994 administrative record contains only general identification of the detrimental effects on bull trout from damage to spawning and rearing habitats caused by siltation, erosion, and stream cover removal ***." *Id.* at 30. "Based on the 1994 administrative record, the present or threatened destruction, modification, or curtailment of bull trout or range is not a factor that would support listing of the Saskatchewan River distinct population segment." *Id.* Similarly, because of "changes in sportfishing management strategies aimed at protection and recovery of bull trout" in Alberta, "the 1994 record does not substantiate overutilization of bull trout for commercial, recreational, scientific, or educational purposes as a factor that would support listing the Saskatchewan River distinct population segment," *id.* at 32–33, and "[t]he 1994 administrative record contains no information suggesting that disease or predation threaten this distinct population segment." *Id.* at 34. The 1994 record is similarly limited regarding the effectiveness of environmental regulations:

> Though lack of Canadian regulations and enforcement was cited as a major bull trout status issue ***, the 1994 administrative record indicates that angling restrictions are in place and anglers are encouraged to protect bull trout. Other Canadian environmental regulations and habitat protection laws are not addressed in the 1994 record. As a result, the 1994 administrative record does not document inadequate existing regulatory mechanisms for the Saskatchewan River distinct population segment.

*Id.* at 35. Finally, the 1994 record gave checkered information regarding other threats:

> The 1994 administrative record indicates that introductions of exotic species, such as brown trout and brook trout, are suspected to have caused reduced production of bull trout in some areas ***. It is possible that exotics have extended their ranges to fill vacant habitat left by overharvest of bull trout. However, these observations are not supported by detailed studies or scientific analysis. Therefore, based on the 1994 record, other natural or manmade

factors are not demonstrated to affect the continuing existence of the Saskatchewan River distinct population segment.

*Id.* at 38.

Because information was lacking in the 1994 administrative record about the abundance of bull trout in the Saskatchewan River basin, and in light of the five factors, USFWS concluded that listing of the Saskatchewan River population segment was not warranted. *Id.* at 40.

## B. The Proposed Rule

On June 13, 1997, as noted above, USFWS published its proposed rule to list the Klamath River and Columbia River population segments of bull trout pursuant to the ESA. 62 Fed.Reg. 32268. Noting again that "[b]ull trout display a high degree of sensitivity at all life stages to environmental disturbance and have more specific habitat requirements than many other salmonids," *id.* at 32268, USFWS emphasized that "[s]everal bull trout life history features make them exceptionally sensitive to activities directly or indirectly affecting stream channel integrity and altering natural flow patterns." *Id.* at 32269. In addition, "[s]uccessful bull trout spawning and development of embryos and juveniles requires very cold water temperatures," *id.*, and, although migratory forms of bull trout facilitate genetic interchange and help restore extirpated local populations, "[m]igratory bull trout have been restricted and/or eliminated due to stream habitat alterations ***." *Id.* "The disruption of migratory corridors, if severe enough, will result in the loss of migratory life history types and isolate resident forms from interacting with the metapopulation." *Id.*

As in the REVISED 1994 FINDING, USFWS jumped straight to its analysis of distinct population segments, noting again that "[t]his approach was undertaken because bull trout occur in widespread but fragmented habitats and have several life history patterns. In addition, the threats to the fish are diverse, and the quantity and quality of information regarding the population status and trends of bull trout varies greatly." *Id.* It then proceeded to report the information discussed above for the Klamath River and Columbia River population segments. *Id.* at

32269–81. As in the REVISED 1994 FINDING, moreover, it discussed the five ESA factors for the bull trout species throughout its range but made listing decisions only for the five population segments.

After reaching its decision to list the Klamath River and Columbia River population segments, USFWS declined to identify critical habitat for them, finding that "the determination of critical habitat is not determinable for these distinct population segments based on the 1994 administrative record." *Id.* at 32281. "The Service reached this conclusion because the biological needs of the species in the two population segments are not sufficiently well known to permit identification of areas as critical habitat in the 1994 administrative record. Specifically, no information was available in the 1994 record on the number of individuals required for a viable population throughout the distinct population segment." *Id.*

## STANDARDS OF REVIEW

█ Both sides have moved for summary judgment. Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed .R.Civ.P. 56(c). Here, the only challenge presented is a legal one: Are USFWS's decisions in its REVISED 1994 FINDING to make listing decisions for the bull trout species only on the basis of five population segments and to not propose three of those segments for listing under the ESA sufficiently reasoned and supported by the record to withstand judicial scrutiny? Therefore, summary judgment is an appropriate vehicle for resolving this dispute.

█ USFWS's actions pursuant to the ESA are reviewed under the federal Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981–82 (9th Cir.1985). Under this standard, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A

decision is arbitrary and capricious if the agency 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43, 103 S.Ct. 2856 (citations omitted). Finally, an agency must set forth clearly the grounds on which it acted. *Atchison T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's, Inc.,* 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Nevertheless, the reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## DISCUSSION

### A. The Endangered Species Act

In 1973, Congress enacted the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 to 1543, "to provide a program for the conservation of *** endangered and threatened species." 16 U.S.C. § 1531(b). In order to receive the Act's protections, a species must be "listed" as endangered or threatened by the Secretary of the Interior, who has delegated his duties for terrestrial species to the federal Fish and Wildlife Service (USFWS).[3]

---

3. 50 C.F.R. § 17.1. The National Marine Fisheries Service has been delegated ESA listing re-     sponsibilities for marine species.

In determining whether to list a species, USFWS determines whether the species "is a threatened or endangered species because of any of the following factors:"

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In addition, the Secretary of the Interior, through USFWS, must make listing determinations "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation *** to protect such species ***." 16 U.S.C. § 1533(b)(1)(A). Finally, USFWS can issue emergency regulations when a situation poses "a significant risk to the well-being of any species of fish or wildlife or plants" if it gives proper notice. 16 U.S.C. § 1533(b)(7). Such emergency regulations remain in effect for 240 days. *Id.*

Citizens can petition USFWS to list a species. 16 U.S.C. § 1533(b)(3)(A). In general, USFWS must make a finding within 90 days of the petition's submission "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* the action is warranted, USFWS commences "a review of the status of the species concerned," *id.*, and within 12 months must find either that: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) "[t]he petitioned action is warranted, but

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action *** is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists *** and to remove from such lists

species for which the protections of this chapter are no longer necessary ***."

16 U.S.C. § 1533(b)(3)(B).

## B. Population Segments versus the Entire Continental Population

### 1. USFWS's Identification of Five Population Segments of Bull Trout Is Not in Itself Arbitrary and Capricious, But Its Reliance on the 1996 Policy Is Inappropriate Here

Plaintiffs first challenge USFWS's RE-VISED 1994 FINDING on the grounds that USFWS had no basis for dividing the bull trout species into five population segments. As an initial matter, this court notes that the ESA itself, since 1978, defines "species" to include not only an entire species but also "any subspecies of fish or wildlife or plants, and *any distinct population segment of any species of vertebrate fish of wildlife which interbreeds when mature.*" 16 U.S.C. § 1532(16) (emphasis added), as amended by Pub.L. 95–632, § 2(5), (7), 92 Stat. 3751 (Nov. 10, 1978). USFWS's regulations incorporate this definition, 50 C.F.R. § 424.02(k), and USFWS has promulgated a policy regarding its recognition of distinct population segments. "Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act," 61 Fed. Reg. 4722 (February 7, 1996).

This 1996 policy focusses on how USFWS will determine when a distinct population segment exists and delineates three factors that the agency will consider:

1. Discreteness of the population segment in relation to the remainder of the species to which it belongs;

2. The significance of the population segment to the species to which it belongs; and

3. The population's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

61 Fed.Reg. at 4725. A population segment is discrete if "[i]t is markedly separated from other populations of the same taxon as a consequence of physical, physiological, eco-

logical, or behavioral factors" or if "[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant \*\*\*." *Id.* Consideration of significance includes, but is not limited to:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. · Evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.* Finally, USFWS evaluates status through the five factors identified in the ESA itself, as it would for an entire species. *Id.*

■ USFWS used its 1996 policy to identify five discrete and significant population segments of bull trout. While the bases for these segments' discreteness and significance is supported by evidence in the 1994 administrative record, it is not clear to this court whether USFWS proceeded with these population segments *because of* the 1996 policy. I agree with plaintiffs that USFWS should not have relied on the 1996 policy to revisit a 1994 decision. Therefore, to the extent that USFWS relied on a later policy for its approach in the REVISED 1994 FINDING, its approach in that revision was arbitrary and capricious.

**2. In Addition, USFWS's Failures to Consider Listing the Entire Bull Trout Population and Its Failure to· Explain Its Change in Population Segment Delineation from the Coterminus United States Is Arbitrary and Capricious**

■ As the history of this litigation makes clear, the REVISED 1994 FINDING does not exist in a vacuum: USFWS has reviewed the information in the 1994 administrative record before, and its prior conclusions are relevant

in determining whether its current decisions are arbitrary and capricious. In both the ORIGINAL 1994 FINDING and the 1995 FINDING, USFWS found that listing of the bull trout was warranted, although precluded, throughout the coterminous United States. Moreover, these two findings expressly explained why listing for the species' entire range, including Canada and Alaska, was not warranted. USFWS has now decided to proceed solely on a five population segment basis. This court finds that this inadequately-explained sudden switch in tactics is arbitrary and capricious, even aside from USFWS's reliance on the 1996 policy.

As USFWS's own population segment policy acknowledges, listing of population segments is a proactive measure to *prevent* the need for listing a species over a larger range—*not* a tactic for subdividing a larger population that USFWS has already determined, on the same information, warrants listing throughout a larger range. *Id.* at 4725. USFWS has not explained why subdividing the coterminus United States population into five population segments is now appropriate. USFWS stated that the five population segment approach "was undertaken because bull trout occur in widespread but fragmented habitats and have several life history patterns. In addition, the threats to the fish are diverse, and the quantity and quality of information regarding the population status and trends of bull trout varies greatly." REVISED 1994 FINDING at 5. However, this "explanation" does not identify why these details—which have not changed since the ORIGINAL 1994 FINDING and the 1995 FINDING—suddenly warrant an entirely new approach to the listing process. Moreover, as in the ORIGINAL 1994 FINDING, USFWS seems to have ignored its own conclusion that fragmentation, isolation, and loss of the migratory forms are factors that contribute to the decline of the *entire* population of bull trout.

Finally, USFWS's approach of looking only at five distinct population segments fails to address the entire scope of the petition. The petition requested USFWS to list the bull trout throughout its range. Although USFWS noted that "numerous bull trout

**1134**

populations are isolated from each other because of unsuitable habitat and/or impassible dams and diversions," counsel stipulated at oral argument that the five "significant" population segments cover the entire population of bull trout in the coterminus United States. Nevertheless, in the REVISED 1994 FINDING USFWS failed to address the entire range of the species as a single unit.

■ Caselaw addressing the issue of population segments and listing decisions is extremely limited, and no federal court that this court could find has squarely addressed the issue of when and whether USFWS must address an entire species or larger populations before addressing distinct population segments. However, as this court indicated in its earlier opinion with respect to emergency listings, USFWS's findings should be at least comprehensive enough to address the scope of the petition to list. *Friends of the Wild Swan, Inc. v. United States Fish & Wildlife Serv.*, 945 F.Supp. 1388, 1394–96 (D.Or.1996) (holding that when a petition explicitly requests that USFWS make emergency listings, USFWS must explain why it chose not to do so). Moreover, USFWS's prior practice indicates that it normally spontaneously considers a larger population for listing even when the petition requests only that a distinct population segment be listed. *See Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 674–75 (D.D.C.1997) (tracing how USFWS's response to petitions to list various populations of the lynx had tracked the scope of those petitions and noting that USFWS spontaneously expanded its focus from the Northern Cascades population species to the entire continental population when the smaller population segment did not independently warrant listing); *Southwest Center for Biological Diversity v. Babbitt*, 926 F.Supp. 920, 922 (D.Ariz.1996) (noting that USFWS addressed the issue of whether the northern goshawk was a distinct population segment when a petition petitioned only to list that subpopulation, but again spontaneously considered the entire species when listing of the subpopulation was not warranted).

Plaintiffs here petitioned to have the bull trout listed throughout its range, and USFWS's approach in the REVISED 1994 FINDING fails to determine either whether such a listing is warranted or whether listing is warranted for a population larger than the five population segments identified. Because USFWS failed to address the entire scope of the petition and failed to explain why it no longer considers listing of the bull trout in the coterminous United States warranted, the REVISED 1994 FINDING is arbitrary and capricious.

However, nothing in the ESA or USFWS's rules precludes USFWS from proceeding on a population segment basis if it legitimately concludes, after proper and sustainable analysis, that listing of the entire species *or the* bull trout population in the coterminous United States is either not warranted or warranted but precluded. Indeed, such a two-tiered approach would promote the ESA's goals of protecting endangered and threatened species and endangered and threatened population segments as quickly as possible. Therefore, this court remands the REVISED 1994 FINDING to USFWS so that it can make listing determinations for the bull trout throughout its range and within the coterminous United States; however, this court leaves intact the five-population-segment approach as a second tier of analysis.

## C. Decisions Not to List Individual Population Segments

### 1. Coastal/Puget Sound Population Segment

Plaintiffs challenge USFWS's decision that listing of the Coastal/Puget Sound population segment was not warranted because, plaintiffs assert, USFWS reached opposite conclusions regarding this population segment in the ORIGINAL 1994 FINDING and the REVISED 1994 FINDING, even though the administrative record was the same. In many ways, the two analyses are similar. Both findings, for instance, recognize that populations of bull trout in the northern regions are better off than populations in the southern regions; that populations in some drainages are stable while others face a high risk of extinction; and that information on long-term population trends is limited. However, the two findings do reach radically different conclusions, largely because of how USFWS extrapolated from what was known to what was unknown.

In the ORIGINAL 1994 FINDING, USFWS stated that "[t]he current status of charr populations in the Coastal/Puget Sound Basin is largely unknown, but existing threats and historic habitat losses indicate population stability is precarious." *Id.* at 9. Although "[l]ong-term population trends throughout the basin have yet to be investigated," it was nevertheless "clear that many drainages have all but lost their salmonid populations due to habitat degradation and other factors ***." *Id.* The "[o]verall status in the Puget Sound Basin appears to be tenuous outside of the northern-most drainages of the Nooksack, Skagit, and Skykomish Rivers," *id.,* and even in the northern regions, "trend data are available for only two index areas that are not typical of habitat conditions in the basin." *Id.* In the light of limited information, USFWS relied on what it knew about salmonid populations generally to conclude that:

> While most charr populations in western Washington have not been monitored, serious declines in other salmonids have been well documented ***. These salmonids have less restrictive habitat requirements than bull trout and spend only a portion of their life cycle in these rivers and streams. In light of widespread habitat and migration disruption, the Service believes similar declines are likely to have occurred in many bull trout populations.

*Id.* at 10.

In the REVISED 1994 FINDING, USFWS again noted that "[l]ong-term trends have yet to be investigated, but many drainages have experienced declines in other salmonid species due to habitat degradation and other factors ***." *Id.* at 9. Moreover, USFWS again acknowledged that "[b]ull trout display a high degree of sensitivity at all life stages to environmental disturbance and have more specific habitat requirements than many other salmonids." *Id* at 3. Nevertheless, USFWS concluded that:

> The trend of this distinct population segment is stable to increasing based on the 1994 record. Eleven of the 29 subbasin populations in the Puget Sound area are either stable, increasing, or secure. Although the status of the remaining 18 subbasins is unknown, the Service considered known documented trends within a distinct

population segment to be representative of the entire population segment.

*Id.* at 38. This conclusion, moreover, rests primarily on trends observed for the northernmost populations—areas that USFWS originally found to be atypical of most charr habitat.

■ "An agency acts arbitrarily when it departs from its precedent without giving good reason." *Northern California Power Agency v. F.E.R.C.,* 37 F.3d 1517, 1522 (9th Cir.1994). The REVISED 1994 FINDING continues to accept that salmonids are generally in decline throughout the Coastal/Puget Sound region and that bull trout are more sensitive to habitat changes than are salmonids generally. However, rather than extrapolate from this known information, USFWS chose to extrapolate from "trends" of bull trout populations in habitat that it had previously considered atypical and to rely on data from the Washington Department of Wildlife (WDW) that it previously considered to "underestimate" the risk to bull trout populations. *Compare* ORIGINAL 1994 FINDING at 8–9 *with* REVISED 1994 FINDING at 8–9. USFWS's own assessments of the information available in the 1994 record thus suggest that the known trends for salmonids generally are the "best scientific evidence available," as the ESA requires USFWS to consider.

At oral argument, USFWS suggested that there are legitimate and rational explanations for these differences. However, its *post hoc* rationalizations in litigation cannot support an otherwise inadequate explanation. USFWS has failed to explain why extrapolation from less than half the basins containing bull trout (11 of 29) and from analyses that underestimate the risk to bull trout is a better evaluation of bull trout population trends than its previous extrapolations from salmonids generally. This court thus finds that USFWS's decision that listing of the Coastal/Puget Sound population segment was not warranted is arbitrary and capricious.

### 2. Jarbridge River Population Segment

As plaintiffs acknowledge, USFWS relied primarily on data from the Nevada Department of Wildlife (NDOW) to reach its conclusions regarding the Jarbridge River popula-

tion segments. I have reviewed all of the information from this agency in the record. NDOW has been consistent in reporting that bull trout populations are low in the Jarbridge River system but that there is no data to indicate that the population size has changed since at least the 1950s. Moreover, NDOW has consistently suggested that bull trout may be historically rare in the Jarbridge River and that the population, although small, may be at or near its potential for that basin. Therefore, without more definite information that the Jarbridge River population of bull trout has actually experienced an historic decline, I cannot say that USFWS was arbitrary or capricious in its decision that listing of this population segment was not warranted.

### 3. Saskatchewan River Population Segment

Plaintiffs challenge USFWS's decision not to list this population segment on the basis that it has been reported to have declined historically and because little is known about the population status of bull trout within those portions of the Saskatchewan River basin that are within the United States. However, once USFWS has identified a population segment, its duty is to evaluate the entire population segment, and plaintiffs do not challenge USFWS's findings that, for the Canadian portion of the Saskatchewan River basin, "bull trout are presently widespread in Alberta" and "[t]he species reportedly is not now in danger of extinction in Alberta ***." REVISED 1994 FINDING at 40. Therefore, I cannot say that USFWS was arbitrary and capricious in determining that listing of this population segment was not warranted.

### CONCLUSION

Plaintiffs' and defendant's cross motions (# 176, # 190) for summary judgment regarding the REVISED 1994 FINDING are each GRANTED in part and DENIED in part. That finding is remanded to USFWS with instructions that: (1) USFWS shall consider whether listing of the bull trout is warranted throughout the species' entire range; (2) if listing over the entire range is not warranted, USFWS shall either consider whether listing of the bull trout is warranted throughout the coterminous United State's *or* explain

why the coterminous United States population of bull trout is no longer an appropriate population for it to consider; (3) if USFWS determines that listing of these larger populations is either not warranted or warranted but precluded, it shall reconsider whether listing of the Coastal/Puget Sound subpopulation is warranted; and (4) none of this evaluation process is to in any way affect the ongoing listing of the Klamath River and Columbia River population segments.

IT IS SO ORDERED.