**AMERICAN WILDLANDS,
et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. Civ.A. 00–2521(EGS).**

United States District Court,
District of Columbia.

March 31, 2002.

Timothy Joseph Preso, Earthjustice Legal Defense Fund, Bozeman, MO, for plaintiffs.

Seth M. Barsky, U.S. Department of Justice, Environmental Division, Washington, DC, for Bruce Babbitt, Jamie Clark, defendants.

Jean Eva Williams, Mauricia M.M. Baca, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Thomas Slonaker, Marshall Jones, defendants.

Mauricia M.M. Baca, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Seth M. Barsky, U.S. Department of Justice, Environmental Division, Washington, DC, for Gale Norton, defendant.

Steven William Strack, Harriet A. Hensley, Idaho Attorney General, Boise, ID, for State of Idaho, amicus.

Robert N. Lane, Montana Department of Fish, Wildlife and Parks, Helena, MT, for State of Montana, amicus.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

This matter stems from a challenge brought by plaintiffs to a decision made by the United States Fish and Wildlife Service ("FWS") that listing the Westslope cutthroat trout ("WCT") as endangered or threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et. seq.*, is not warranted at this time.

Pending before the Court are cross motions for summary judgment. The Court has carefully considered the parties' motions and the responses and replies thereto, the briefs filed by Amici Montana and Idaho, the administrative record in this case, oral argument of counsel at the hearing held November 2, 2001, the parties' proposed findings of fact and conclusions

of law and the responses thereto, and the applicable statutory and case law. The Court finds that the agency decision that listing of the WCT as endangered or threatened was not warranted was arbitrary and capricious and not supported by the best available scientific data. Accordingly, the Court **GRANTS** plaintiffs' motion for summary judgment, **DENIES** defendants' motion for summary judgment and **REMANDS** this matter to FWS with instructions that it reconsider its "not warranted" finding for WCT in light of this Court's decision.

## I. Background

The westslope cutthroat trout [1] is one of fourteen subspecies of cutthroat trout native to interior streams in western North America. The historic habitat of WCT consists of several major drainages of the upper Columbia River basin (Idaho and Montana), the Methow River and Lake Chelan drainages (Washington), the John Day River drainage (Oregon), the headwaters of the South Saskatchewan River (Montana), and the upper Missouri River basin (Montana and Wyoming). The historic range of WCT is considered to be the largest of any of the cutthroat trout subspecies.

Plaintiffs in this case are five environmental organizations—American Wildlands, Idaho Watersheds Project, Montana Environmental Center, the Clearwater Biodiversity Project and the Madison–Gallatin Chapter of Trout Unlimited—and one individual, Bud Lilly, who fishes in WCT habitat and who is a board member of American Wildlands.

Plaintiffs formally petitioned FWS to list the WCT as threatened throughout its range and designate critical habitat for the subspecies pursuant to the ESA. On April

14, 2000, FWS issued a formal determination that listing of the WCT under the ESA was not warranted. *See* 65 Fed.Reg. 20120.

Plaintiffs bring suit against Gale Norton, Secretary of the Department of Interior, and Marshall Jones, Acting Director of FWS, claiming that the Service's listing determination was arbitrary and capricious and a violation of the Administrative Procedure Act and requesting that the Court remand the determination to the Service for reasoned consideration. The State of Montana and the State of Idaho have entered their appearances as Amicus Curiae.

### A. The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Act defines a species as "any subspecies of fish or wildlife ... and any distinct population of any species of vertebrate fish or wildlife which interbreeds when mature." § 1532(16). A species is "endangered" when it is in "danger of extinction throughout all or a significant part of its range," and a species is "threatened" when it is "likely to become an endangered species within the foreseeable future." §§ 1532(6), 1532(20), 1533(c).

The ESA directs the Secretary of the Interior to determine whether to list species of flora and fauna as endangered or threatened. FWS is obligated to independently identify species for listing, and to respond to listing petitions from the public. § 1533(b)(3)(A). Where there is a public petition for listing, the FWS has ninety

---

**1.** The Latin name for the subspecies is *oncorhynchus clarki lewisi,* named after Lewis and Clark.

days from the filing of the petition, in which to determine whether the petition presents substantial scientific or commercial information indicating that a listing may be warranted. § 1433(b)(3)(A). If FWS issues a "may be warranted" finding, the Service then has twelve months to complete a "review of the status of the species concerned" to determine if listing is "warranted." §§ 1533(b)(3)(B), 1533(b)(5). If the agency concludes that listing is warranted, it must publish a proposed rule in the *Federal Register* and provide an opportunity for public comment. § 1533(b)(5). Twelve months after publication of the proposed rule, the agency must make a final decision whether to adopt a final rule listing the species under the ESA. *Id.*

When making its determination as to whether a species should be listed as endangered or threatened, the agency must consider the following five factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). The ESA also instructs that the agency's determination as to whether to list a species under the Act be made "solely on the basis of the best scientific and commercial data available." § 1533(b)(1)(A).

**B. Procedural Background**

On May 21, 1997 American Wildlands submitted a petition to the FWS requesting the listing of the WCT as a threatened species under the ESA. The petition described reasons warranting the listing and provided information about threats to the trout's habitat, hybridization of the trout population, predation and the trout's distribution patterns. On January 23, 1998, American Wildlands supplemented its petition with information detailing increasing threats to the trout.

On March 17, 1998, American Wildlands brought suit to compel FWS to issue a 90–day finding on the WCT listing petition as required by 16 U.S.C. § 1533(b)(3)(A). FWS then agreed to prepare a 90–day finding, and, in June 1998, it published its determination that American Wildlands' petition provided sufficient information to conclude that a listing of the westslope cutthroat trout as a threatened species "may be warranted." 63 Fed.Reg. 31691 (June 10, 1998).

Following the "may be warranted" determination and publication, FWS failed to meet its twelve-month statutory deadline for making a final determination as to the trout's listing. *See* 16 U.S.C. § 1533(b)(3)(B). In March 1999, almost eleven months after the twelve-month statutory period had run, American Wildlands provided notice to FWS that it was in violation of ESA and its implementing regulations. On August 4, 1999, American Wildlands filed suit to compel FWS to issue its twelve-month finding. In March 2000, FWS and American Wildlands reached a settlement that provided that FWS would publish its twelve-month finding on or before April 10, 2000.

On April 14, 2000, FWS published its finding on American Wildlands' petition to list the WCT as a threatened species. 65 Fed.Reg. 20120 (April 14, 2000). FWS determined that listing the WCT was not warranted at that time.

On October 23, 2000, Plaintiffs filed the instant suit alleging four claims. Plaintiffs allege that FWS' consideration of existing regulatory mechanisms was arbitrary.

Plaintiffs further claim that FWS' consideration of hybridization as a threat to WCT was arbitrary because, while identifying hybridization as a primary threat, FWS relied on a draft policy, which contained hybridized fish, to establish the trout's population size and distribution. Plaintiffs' third claim avers that FWS arbitrarily considered the threats to the trout posed by isolation and loss of life histories, factors which have allegedly formed the basis for other threatened listings. Finally, Plaintiffs claim that FWS failed to account for the threat of whirling disease and other important factors, identified in Plaintiffs' 60–day notice of ESA violations, and that the decision to not list trout as endangered was arbitrary and capricious. At oral argument, plaintiffs conceded that their strongest argument, and the one from which their other concerns stemmed, was that FWS included hybridized fish in the population considered for listing, while also recognizing hybridization as a threat to the species. Plaintiffs request that the court remand the listing decision to FWS for a reasoned decision-making process.

## II. Discussion

### A. Standing

■ Defendants initially contended that plaintiffs did not have standing because plaintiffs had failed to attached affidavits from members of their organizations and, thus, had not met the summary judgment standard. At the summary judgment stage, a plaintiff cannot rest on mere allegations of injury, but must provide affidavits or other evidence demonstrating that he or she has standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs attached five affidavits from members of their organizations to their reply brief, and defendants, in their reply, state that they no longer contest standing.

■ To establish Article III standing, a plaintiff must demonstrate that: (1) he has personally "suffered an 'injury in fact,'—an invasion of a legally-protected interest; which is (a) concrete and particularized, and (b) 'actual or imminent', not 'conjectural' or 'hypothetical'"; (2) the injury complained of is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (internal citations omitted). Once plaintiffs have demonstrated that they have a specific interest in the protection of the westslope cutthroat trout, a procedural violation manifested by the failure to list the trout as warranting protection may fulfill the "redressability" prong of the standing test. "[P]rocedural rights are special: the person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability...." *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

■ Plaintiffs assert that their cognizable interests in protecting westslope cutthroat trout are harmed by FWS' arbitrary decisions, and that a favorable decision by this Court would remedy that injury by requiring the agency to reconsider its listing decision in a non-arbitrary manner. The affidavits provided with plaintiffs' reply brief support these assertions, and the Court concludes that plaintiffs have established Article III standing.

■ Five of the six plaintiffs are environmental organizations. These organizations have established that they have associational standing. The members of all the plaintiff groups have standing in their own right; protection of the WCT is at the core of the groups' respective missions; and there is no need for individual members to participate in this lawsuit. *See Hunt v. Washington State Apple Adver. Comm'n,*

432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### B. Standard of Review

▊ Plaintiffs bring suit pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). The Service's determination as to whether to list a species as endangered or threatened is subject to review under the APA. *See Las Vegas v. Lujan,* 891 F.2d 927, 932 (D.C.Cir.1989) (invoking APA's arbitrary and capricious standard in considering citizen suit challenge to an ESA emergency listing decision).

▊ Under Section 702 of the APA, an agency's decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The D.C. Circuit has instructed that the citizen suit provisions of ESA provide a right to challenge agency decisions, but do not permit *de novo* review. *See Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C.Cir.1982). Rather, this Court's review is limited to the administrative record before the agency when it made its decision. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Where a party has petitioned the Service for a listing, as is the case here, the information included in the petition is necessarily a part of the administrative record.

▊ Under the APA's standard of review, there is a presumption of validity of agency action. *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 521 (D.C.Cir.1983) (citations omitted).

However, an agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

### C. Best Available Scientific Data Requirement

▊ Defendants argue that the only relevant issue is "whether a review of the administrative record underlying FWS's not-warranted finding reveals that the determination was rationally based." However, under the ESA, the Secretary's actions must be based on the *"best scientific and commercial data available to him"* after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A). This requirement does not obligate the Service to conduct new, independent studies. *See Southwest Center for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C.Cir.2000) (finding no obligation under the ESA to conduct new research).

▊ The ESA, by adopting a standard of the "best scientific and commercial data available," and not a standard of absolute certainty, reflects Congress' intent that the FWS take conservation measure before a species is " 'conclusively' headed for extinction." *Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670, 680 (D.D.C.1997). "The Service may not base its listings on speculation or surmise or disregard superior data, ... but absent superior data ... occasional imperfections do not violate" ESA's requirement that FWS use the best available data. *Bldg. Ind. Ass'n of Sup.*

*Cal. v. Norton,* 247 F.3d 1241, 1246–47 (D.C.Cir.2001).

■ The Court's review of the scientific data included in the administrative record is limited to an inquiry as to whether the record supports the agency's findings and whether the agency's actions were based on the "best scientific . . . data available" to it. This Court is not in a position to make policy judgments based on conflicting or uncertain scientific data. "[W]here there are competing expert opinions, '[i]t is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the scientific data.'" *Brower v. Daley,* 93 F.Supp.2d 1071, 1082–83 (N.D.Cal.2000) (quoting *Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1433 (M.D.Fla.1998). In *Ethyl Corporation v. EPA,* the D.C. Circuit cautioned that: "We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." 541 F.2d 1, 36 (D.C.Cir.1976) *(en banc )* (footnote omitted).

### D. ESA Listing Decision

FWS concluded that listing of WCT under ESA was unwarranted because "viable, self-sustaining WCT stocks remain widely distributed throughout the [species'] historic range" and because small headwaters populations of WCT are "relatively secure." Plaintiffs allege that the "unwarranted" finding constituted arbitrary and capricious agency action. Specifically, plaintiffs allege that FWS' inclusion of hybrid WCT stocks in the "viable" population of WCT was arbitrary and capricious (Count 2). They also challenge as arbitrary and capricious the agency's consideration of existing regulatory mechanisms (Count 1) and its consideration of the threats posed by isolation of WCT populations (Count 3) and by whirling disease and other important factors (Count 4). Defendants respond that FWS carefully considered all of the information collected, represented in the Administrative Record, and weighed each of the relevant statutory listing criteria before determining that a listing under the ESA was not warranted.

Because the Court holds that WCT's inclusion of hybrid WCT stocks in the "viable" population considered for listing was arbitrary and capricious, the Court does not focus on the additional concerns raised in plaintiffs' complaint. The agency's consideration of the existing regulatory mechanism, threats and possible diseases facing the population was necessarily affected by its definition of the population to be considered for listing.

### 1. Hybridization

The parties do not dispute that hybridization of the WCT stock constitutes a "natural or manmade factor[ ] affecting [WCT's] continued existence," and was properly considered in the Service's assessment of the listing petition. *See* 16 U.S.C. § 1533(a)(1)(E). The parties' arguments as to the relevance and significance of hybridization raise two distinct legal issues (although the parties do not distinguish them as such). First, the parties disagree as to the relative weight to be given to the factor of hybridization as a threat to WCT, with plaintiffs contending that the failure to list WCT as threatened in light of scientific studies on hybridization constitutes arbitrary agency action. The second issue raised by hybridization concerns the very identification of the "population" under review for an ESA listing. Does the ESA require that only 100% genetically pure individual fish be considered for purposes of determining

dangers of extinction to the species? Plaintiffs contest that the inclusion of hybrid stock numbers in the WCT population count is *per se* unreasonable, while defendants argue that the ESA does not mandate that only genetically pure fish be counted in determining the species' status. This Court defers to the policy judgments of FWS in weighing hybridization as one of many factors, but finds that FWS' rationale for the inclusion of hybrid fish in the population identified for evaluation in the *Status Review* is unsupported by the administrative record.

*Hybridization as a Threat*

In their pleadings, both FWS and plaintiffs view hybridization of WCT as a potential threat to the trout population. They disagree as to the weight that should be given to this threat. The Court should remand an agency finding where the conclusions are arbitrary and capricious, or where the agency failed to consider relevant information or factors.

Plaintiffs protest that the administrative record clearly identifies hybridization as the greatest single threat. *See Status Review* at 20, 93, 158; AR 407–08; Liknes and Graham, A.R. 5977. Plaintiff relies on the record in identifying several significant harms stemming from hybridization, including impairment of "growth, survival, fertility, developmental rate, and the ability of individuals to develop properly." *See* A.R. 855; A.R. 2386 (Allendorf & Leary article). FWS recognized that the best available science indicates that hybridization constitutes a significant threat to WCT. *See Status Review* at 20, 158.

However, as a factor affecting the WCT's continued existence, FWS was required to consider whether the threat of hybridization was sufficient to warrant listing of WCT as a threatened or endangered species. 16 U.S.C. § 1533(a)(1)(E). In its Status Review, FWS identified hybridization as an ongoing threat in each of the 15 watersheds occupied by WCT. Yet, the record is devoid of any evidence that the agency evaluated that threat in considering whether the WCT population was viable.

Defendants assert that the Service extensively considered the issue of hybridization and "reasonably determined that, while it conceivably can pose a threat to WCT, any such threat that exists today does not rise to the level of indicating that the WCT subspecies as a whole is in danger of extinction throughout all or a significant portion of its range, or is likely to become an endangered species throughout all or a significant portion of its range...." Defendants rely on a FWS draft Intercross policy addressing genetic introgression and a scientific study indicating that at least some degree of hybridization would not threaten WCT. Yet, the draft Intercross policy in no way indicates what degree of hybridization *would* threaten WCT, or that the existing levels of hybridization do not currently threaten WCT.

*Inclusion of Hybrid Stock in the WCT Population Considered for Listing*

The agency's justification of its listing decision is arbitrary not because it fails to consider hybridization as a threat but because—once identifying hybridization as a threat—the agency includes hybrid fish in the population considered for listing. If hybridization is a "threat" to the species, it would seem logical that hybrid stock should not be included in the population of WCT reviewed for protected status.

The administrative record wholly fails to address the implications of including hybrid stock in the "population." In evaluating the health of a species' population, FWS is required to consider whether the species is likely, in the foreseeable future, to become endangered or extinct throughout all or a significant portion of its range.

16 U.S.C. §§ 1532(6), 1532(20). In order to make its determination as to whether an ESA listing for WCT was warranted, FWS was required to identify the WCT population[2] and then consider the best available scientific data concerning the threats to the population and its habitat. Consequently, the identification of the potentially viable—or endangered—population is vital to ultimate listing determination.

The FWS has defined "population" as "a group of fish or wildlife ... in common spatial arrangement that interbreed when mature." 50 C.F.R. § 17.3. Plaintiffs' petition identified "remaining, *genetically pure* stocks of WCT" as warranting listing consideration. 65 Fed.Reg. 20120, 20120 (emphasis added). FWS explained its identification of the relevant WCT population:

> Throughout the historic range of WCT, few of the remaining WCT stocks have been genetically classified on the basis of chromosome counts, biochemical characteristics, or molecular genetic information. Although application of such genetic techniques for characterizing fish stocks is becoming more common today, in most cases the taxonomic classification of extant WCT stocks has been based largely on the spotting patterns shown by the fish and the professional judgments and experiences of the fishery biologists who examined the fish in the field. Although WCT stocks with varying degrees of genetic purity are known to occur across the subspecies' range, there is currently little definitive information on the genetic characteristics of most WCT stocks (U.S. Fish and Wildlife Service 1999). Even in Montana, where an extensive database on the genetic characteristics of many WCT stocks exists, the precise genetic characteristics of most stocks are unknown.

Consequently, we based the WCT status review on the professional judgments made by the State game and fish departments that the fish the departments classified as WCT actually represented the subspecies, even though the precise genetic characteristics of those stocks may not be known, or the stocks may consist of intercross progeny that were the product of some low or nondetectable level of interbreeding between WCT and another fish species.

*Status Review*, 65 Fed.Reg. 20120, 20121. Defendants explain that hybrid stock— those whose genetic make-up was unknown and those with low levels of hybridization—was included in the WCT stock reviewed for listing because few of the remaining WCT stocks have been genetically classified. 65 Fed.Reg. 20120, 20120.

Defendants argue that the ESA does not require that only genetically pure species be considered as part of the population. At oral argument, plaintiffs agreed with this proposition, noting that they were not insisting on genetic purity. Rather, plaintiffs argued that the "best available science" must govern the agency's determination of the appropriate population for listing consideration. Thus, plaintiffs would have the agency assert a scientifically-based conclusion about the extent to which it is appropriate to include hybrid stock and stock of unknown characteristics in the population evaluated.

FWS contends that its explanation of the difficulty of identifying hybrid stock is sufficient to meet the requirement that it rely on the best available science. The Court can not agree for two reasons.

First, FWS does not offer a scientifically based explanation for its decision to in-

---

**2.** FWS found that there was no need to recognize distinct population segments ("DPS") for the WCT. The ESA permits the Secretary to recognize DPS for vertebrate fish and animals, and the Service has promulgated regulations defining DPS.

clude known hybridized fish in its assessment of the WCT's current distribution. The instant case presents a unique situation because FWS alleges that the best available scientific data is not sufficient to allow it to clearly identify the intended population subject to review (genetically pure WCT). Fed.Reg. 20120, 20121. However, FWS does not explain how hybridized fish might contribute to the viability of the species, nor does it argue that some degree of hybridization is benign. FWS fails to take into account Montana's finding that more than 40% of sample fish stocks statewide were hybridized. Status Review at 153, App. Table 2. FWS does not suggest that lower levels of hybridization exist outside of Montana.

Furthermore, FWS does not explain its failure to credit Montana's assessment of hybrid stock. Montana has created a genetic database of WCT stock, and has instituted a conservation plan designed to restore "pure" WCT stock to its rivers. Montana's plan distinguishes between 100% pure WCT populations, slightly hybridized WCT populations (90% pure and greater), and other hybrid WCT stock, offering priority protection to the pure and slightly hybridized stock. *See* A.R. at 821. Without assessing the propriety of the distinctions drawn by Montana,[3] the Court notes the Montana plan demonstrates that a reasoned, scientific consideration of which WCT are properly considered as part of a "viable" population is possible and even appropriate. To the extent that the Montana plan represents expertise, upon which FWS relied in making its listing determination, it is troubling that FWS apparently ignored Montana's reasoning and example regarding the need for differentiation between levels of hybridization in WCT stock. *See, e.g., Defenders,* 958

F.Supp. at 685 (holding that "[a]lthough the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts").

Second, and most importantly for this Court's conclusions, the agency wholly fails to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing. The administrative record clearly supports a finding that hybridization is a threat to the WCT population. Indeed, FWS identified the presence of non-native fish and the associated threat of hybridization in every watershed occupied by WCT. Status Review at 89, 91, 93, 95, 97, 99, 106, 112–13, 120–21, 126, 131, 134–35, 146. Therefore, when it included hybrid stock in the population assessed for listing, it needed to give some reasoned explanation.

In *Friends of the Wild Swan, Inc. v. USFWS,* the District Court of Oregon held that the failure of the FWS to explain why it did not consider listing the entire bull trout population as a whole, and changed a previous policy by delineating five population segments of trout, constituted arbitrary and capricious agency action. 12 F.Supp.2d 1121, 1133 (D.Or.1997). The court noted that the change in policy was problematic given that the petition for listing as well as the agency's own findings identified isolation of trout populations as a threat to the species. *Id.* at 1133–34. Similarly, the inclusion of hybrid fish in the population evaluated for protection is arbitrary to the extent that hybridization is identified as a threat to the population by FWS and in plaintiffs' petition for listing.

---

**3.** The Court notes that, in its *amicus curiae* brief, Montana nevertheless suggested that hybrid WCT fish should be counted as WCT until they are genetically more than 50% rainbow or Yellowstone cutthroat trout.

For example, plaintiffs note that it is possible that FWS might have drawn a distinction between hybridization that is a threat to a population, and hybridization that is benign. However, FWS made no attempt to draw such a distinction. The agency is not required to perform additional scientific studies, but the administrative record demonstrates that Montana's experience and the Allendorf and Leary report constitute a basis for at least some reasoned discussion of the issue. Without a scientifically based explanation of the decision, the Court can not but find that the decision to include hybrid stock in the WCT population considered for listing was not supported by the best available science, 16 U.S.C. § 1553(b)(1)(A), and was a "fail[ure] to consider an important part of the problem" facing FWS and was arbitrary and capricious. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

### 2. Other Listing Factors

 Plaintiffs also contend that FWS overstated the protections offered by existing regulations and did not adequately consider threats to isolated headwater populations of WTC.[4] The Court finds that these considerations may be affected by the initial determination of the WCT population. Thus, while the Court will briefly address the issues raised by plaintiffs, it recognizes that these are factors to be considered by FWS on remand, in light of the population it determines to be scientifically appropriate for listing evaluation.

*Existing regulations*

Plaintiff contends that existing regulations are inadequate to protect WCT populations and that the agency's reliance on these regulations is arbitrary and capricious. Having identified hybridization as a threat to WCT, FWS should have identified whether the regulatory mechanisms in place were adequate to protect a viable population of the subspecies.

The agency recognized that stocking of non-native fish in WCT habitat continues. *See, e.g.*, 63 Fed.Reg. at 31, 692. Furthermore, FWS expressly stated that additional government action is needed to address threats posed by non-native species. Status Review at 158. While the agency identified over 700 existing conservation programs benefiting the WCT stock, it is unclear from the record what WCT population will reap the benefit of these programs. On remand, the agency should consider the effect of the programs in light of the population evaluated for listing.

*Isolation of Headwater Populations*

The isolation of headwater populations of WCT is a factor that the agency should consider in making its listing determination, either as a "modification or curtailment of [the species'] habitat or range," 16 U.S.C. § 1533(a)(1)(A), or as a "natural or manmade factor[ ] affecting its continued existence," 16 U.S.C. § 1533(a)(1)(E). FWS found that viable, self-sustaining stocks of WCT remain widely distributed throughout the historic range of the subspecies. *Status Review* at 157. However, this determination is inextricably linked to the determination of the WCT population for listing consideration. One study has estimated that genetically pure westslope cutthroat trout now occupy only 2.5% of their historic range in Montana. *See*

---

**4.** Plaintiffs also argued that FWS' consideration of the threat of whirling disease was arbitrary and capricious. Plaintiffs appear to have abandoned this claim at oral argument and in their proposed findings of fact and conclusions of law. In any event, the Court notes that the record does not contain any scientific study discussing the impact of whirling disease on the WCT population— genetically pure or hybrid.

McIntyre & Rieman, *Conservation Assessment for Inland Cutthroat* (1995), A.R. at 6257.

FWS identifies stronghold populations of WCT in stream headwaters. FWS identified the risks posed by non-native species, and concluded that headwater populations are "relatively secure" from such species. The administrative record supports a conclusion that introduced brook and brown trout may have replaced WCT in many river reaches and lower elevation streams. *See Status Review* at 106; *see also* Comments of Christopher Frissel, A.R. at 2268. The Court, therefore, notes only that the agency's identification of the appropriate population for listing consideration may affect its evaluation of the risks to headwater populations.

### III. Remand to FWS

■ FWS suggests that the appropriate remedy for an inadequate articulation of its consideration of the threat of hybridization is to remand the administrative record to FWS for "further explanation, with the Court retaining jurisdiction to review that explanation and make a decision on the merits at a later time." Defs.' Resp. to Pls.' Findings of Fact at 2. FWS characterizes the Court's concerns as the absence of a sufficient explanation of its review of the hybridization threat. Yet, the Status Report describes the agency's assessment of the hybridization threat. What the record wholly fails to offer is a rationale for including hybrid stock in the population considered for listing.

Nothing in the record convinces this Court that this defect may be cured by a simple explanatory declaration. Rather, the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The agency has ignored scientific data and existing models for assessing the degree of hybridization that may be appro-

priate to include in population assessed for long-term viability.

■ While it may be appropriate to remand an administrative record for additional explanation, such a limited remand is appropriate where a "bare record [does] not disclose the factors that were considered of the [agency's] construction of the evidence." *Citizens to Preserve Overton Park, Inc.v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1974). The record in this matter is far from bare. Furthermore, this is not a case where the Court is "unclear of the grounds the agency asserts to defend its action . . ." *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1086 (D.C.Cir.2001); *accord Environmental Defense Fund v. Costle,* 657 F.2d 275, 285 (D.C.Cir.1981) ("new materials should be merely explanatory of the original record and should contain no new rationalizations"). There is an extensive administrative record that describes FWS' decision to include hybrid stock in the population as resting on a determination that visual professional judgments were the best indication of the WCT population.. The Court today finds that this determination was not supported by the best available science and was arbitrary and capricious. Thus, the Court remands the WCT listing decision to FWS for reasoned decision-making.

### CONCLUSION

For the foregoing reasons and upon careful consideration of the entire record in this case, the Court finds that FWS' listing determination for FWS does not reflect a reasoned assessment of the statutory listing factors on the basis of the best available science. Accordingly, plaintiffs' motion for summary judgment must be **GRANTED,** defendants' motion for summary judgment **DENIED,** and WCT listing decision remanded to FWS for rea-

soned decision-making in light of this Court's decision.

An appropriate Order and Judgment accompany this Memorandum Opinion.

## ORDER AND JUDGMENT

For the foregoing reasons and upon careful consideration of the entire record in this case, the Court finds that FWS' listing determination for FWS does not reflect a reasoned assessment of the statutory listing factors on the basis of the best available science. Accordingly, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment [16] is **GRANTED;** and it is

**FURTHER ORDERED** that defendants' motion for summary judgment [29] is **DENIED;** and it is

**FURTHER ORDERED** that this action be remanded to FWS with instructions that it reconsidered its "not warranted" finding for WCT in light of this Court's decision. In reconsidering whether to list WCT as a threatened species, FWS must evaluate the threat of hybridization as it bears on the ESA's statutory listing factors. Specifically, FWS must determine: (1) the current distribution of the species, taking into account the prevalence of hybridization, 16 U.S.C. § 1533(a)(1)(A); (2) whether the WCT population is an endangered or threatened species because of hybridization, 16 U.S.C. § 1533(a)(1)(E); and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing non-native fish. 16 U.S.C. § 1533(a)(1)(D); and it is

**FURTHER ORDERED** that FWS shall issue a new 12–month Finding for WCT within one year of the entry of this Court's judgment; and it is

**FURTHER ORDERED** and **AD-JUDGED** that the Clerk shall enter final judgment in favor of plaintiffs and against defendants.

**IT IS SO ORDERED.**