**DEFENDERS OF WILDLIFE; et al., Plaintiffs,**

v.

**SECRETARY, UNITED STATES DE-PARTMENT OF THE INTERI-OR; et al., Defendants.**

No. Civ. 03–1348–JO.

United States District Court, D. Oregon.

Jan. 31, 2005.

Anne E. Mahle, Brian B. O'Neill, Elizabeth H. Schmiesing, Richard A. Duncan, Colette Routel, Faegre & Benson, LLP, Minneapolis, MN, Stephanie M. Parent, Portland, OR, for Plaintiffs.

Kristen L. Gustafson, Wildlife & Marine Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, Ben Franklin Station, Washington, DC, Jimmy A. Rodriguez, U.S. Department of Justice, Ben Franklin Station, Washington, DC, Jay A. Jerde, Michael R. O'Donnell, State of Wyoming, Attorney General's Office, Cheyenne WY, Suzanne C. Lacampagne, Miller Nash, Portland, OR, Anna M. Seidman, Safari Club International, Washington, DC, Elizabeth E. Howard, Churchill Leonard Lodine & Hendrie, LLP, Salem, OR, Steven W. Strack, Idaho Attorney General's Office, Boise, ID, David A. Bledsoe, Perkins Coie, LLP, Portland, OR, David F. Hensley, Governor's Office of Species Conser, Boise, ID, L. Michael Bogert, Office of the Governor, Boise, ID, Martha Williams, Robert N. Lane, Montana Department of Fish, Wildlife, Helena, MT, for Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

### INTRODUCTION

On April 1, 2003, the United States Fish and Wildlife Service ("FWS") issued the Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States, 68 Fed.Reg. 15,804 (April 1, 2003) ("Final Rule"). The Final Rule reduced the protection afforded to the gray wolf under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1543, by changing the status of the species from "endangered" to "threatened" in some regions. Plaintiffs Defenders of Wildlife et al. filed this action for declaratory and injunctive relief against Defendant Gail Norton, in her official capacity as Secretary of the United States Department of Interior ("Secretary"), alleging that this change violated the ESA, the

ESA's implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–59, 701–706. The States of Idaho, Montana, and Wyoming, and various non-governmental interest groups intervened as defendants.[1] Plaintiffs seek injunctive relief that would remand the Final Rule to the FWS for reconsideration.

Before the Final Rule, the gray wolf was listed as "endangered" across the conterminous United States, except Minnesota where it was listed as "threatened." The Final Rule creates three Distinct Population Segments ("DPSs")—Eastern, Western, and Southwestern—and reclassifies, or "downlists," the gray wolf from "endangered" to "threatened" in the Eastern and Western DPSs. The gray wolf remains "endangered" in the Southwestern DPS. Plaintiffs claim that FWS violated the ESA because it: 1) failed to assess threats to the wolf in a significant portion of its range, 2) improperly applied the five statutory factors for downlisting, 3) improperly based its decision to downlist on factors Congress did not intend for it to consider, 4) designated DPSs that violate the Act, and 5) abandoned its affirmative duty under the ESA to conserve the wolf.

This case is before the court on the parties' cross motions for summary judgment (## 105, 107, 110, 112, 124, and 127). For the reasons discussed below, I GRANT plaintiffs' motion for summary judgment and DENY defendants' motions for summary judgment.

## STATUTORY FRAMEWORK

Congress enacted the ESA to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species...." 16 U.S.C.

§ 1531(b). A species receives the protections of the ESA when FWS lists the species as "endangered" or "threatened." A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range...." *Id.* at § 1532(6). A "threatened" species "is likely to become an endangered species within the foreseeable future...." *Id.* at § 1532(20). FWS shall list a species as endangered or threatened because of any one or a combination of the following factors: "A) the present or threatened destruction, modification, or curtailment of its habitat or range; B) overutilization for commercial, recreational, scientific, or educational purposes; C) disease or predation; D) the inadequacy of existing regulatory mechanisms; or E) other natural or man-made factors affecting its continued existence." *Id.* at § 1533(a)(1); 50 C.F.R. § 424.11(c). The FWS shall make listing determinations "solely on the basis of the best scientific and commercial data available," without reference to the possible economic or other impacts of such a determination. 16 U.S.C. § 1533(b)(1)(A), 50 C.F.R. § 424.11(c). FWS applies these same five "listing factors" to determine whether threats to a species have decreased enough to warrant downlisting. 50 C.F.R. § 424.11(c). Therefore, in order to downlist a species or DPS, the Secretary must use the listing factors to assess the threats to the species or DPS.

It is unlawful for any person to "take any [endangered] species within the United States." 16 U.S.C. § 1538(a)(1)(B). The Act defines "take" very broadly to include kill, harass, or harm. *Id.* at § 1532(19). Regulations generally ban the take of threatened species, but the FWS can adopt rules under ESA section 4(d), 16 U.S.C. § 1533(d), that allow the take of

---

threatened species under certain circumstances.[2] These so-called "4(d) rules" are important to this case because the Final Rule contains 4(d) rules that permit the take of depredating wolves by private parties.[3] 68 Fed.Reg. at 15,863–68.

The ESA instructs the Secretary to develop and implement plans known as "recovery plans" for the conservation and survival of endangered and threatened species. 16 U.S.C. § 1533(f)(1). The recovery plans shall include "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* "[P]rovisions of this section" includes the listing factors. "Recovery" means improvement in the status of a listed species to the point at which listing is no longer appropriate under the criteria set out in ESA section 4(a)(1), 16 U.S.C. § 1533(a)(1). 50 C.F.R. § 402.02.

The term "species" "includes any subspecies of fish or wildlife or plants, and any distinct population segment...." 16 U.S.C. § 1532(16). Because the ESA does not define the term "distinct population segment," the FWS and National Marine Fisheries Service promulgated regulations (the "DPS Policy") in 1996 to guide the

agency in recognizing DPSs that satisfy the definition of "species" under the Act. 61 Fed.Reg. 4722 (Feb. 7, 1996). The DPS Policy provides that a DPS must be discrete and significant in relation to the species to which it belongs. *Id.* at 4725. FWS determines the listing status of each DPS by applying the listing factors. *Id.* The purpose of the DPS Policy is to allow FWS to list a DPS as threatened or endangered, and thereby provide a level of protection that is different from other populations within the same species. *See Id.* at 4722. "The FWS does not have to list an entire species as endangered when only one of its populations faces extinction." *Nat'l Ass'n of Home Builders v. Norton,* 340 F.3d 835, 842 (9th Cir.2003).

## BACKGROUND

The gray wolf (*Canis lupus*) is a social animal that preys primarily on large mammals. 68 Fed.Reg. at 15,805. Extended families comprise packs that occupy 50 to 500 square kilometers of territory. *Id.* Most yearling wolves disperse from their natal packs to find a mate and unoccupied territory. *Id.*

### A. Range.

Historically, the gray wolf occupied all of the conterminous United States,[4] except

---

**2.** Endangered Species Act ("ESA") section 4(d), 16 U.S.C. § 1533(d), provides, "whenever any species is listed as a threatened species ... the Secretary shall issue such regulations as [s]he deems necessary and advisable to provide for the conservation of the species." This opinion does not decide whether the 4(d) rules in the Final Rule are necessary and advisable.

**3.** The 4(d) rules for the Eastern and Western Distinct Population Segments ("DPSs") allow landowners to kill wolves seen attacking livestock. 68 Fed.Reg. 15804, 15,868 (April 1, 2003). Any wolf can be killed within one mile of the depredation site in Wisconsin and Michigan, and within four miles in the remaining states in the Eastern DPS. *Id.* In the Western DPS, a landowner may receive per-

mission from FWS to shoot a wolf on sight if there have been repeated, confirmed depredations. *Id.* at 15,864. Also, the 4(d) rules allow landowners to harass wolves in a non-injurious manner at any time for any reason. *Id.* The 4(d) rules grant grazing permittees the same right to harass wolves on public land. *Id.* All of the above activities, which are "takes" under the ESA, would be prohibited if the wolf retained its endangered status.

**4.** There is uncertainty about the taxonomy of the wolf that historically occupied the northeastern United States. The wolf was potentially a subspecies of gray wolf (*Canis lupus lycaon*), the red wolf (*Canis rufus*), or the newly named *Canis lycaon,* 68 Fed.Reg. at 15,806.

arid regions of California and the southeastern United States ("Southeast"). The Southeast contains a different species, the red wolf (*Canis rufus*). *Id.* at 15,806. European settlers extirpated the gray wolf from most of the conterminous United States. By the early 1970s, northern Minnesota held the only substantial wolf population. *Id.* at 15,805.

In 1974, FWS listed the gray wolf as threatened in Minnesota and endangered in the forty-seven other conterminous states and Mexico.[5] Joint Statement of Material Fact ("JSMF") ¶ 11. Since the listing, the gray wolf has increased its population and range. Wolves that dispersed from Minnesota recolonized parts of northern Wisconsin and northern Michigan to form a Western Great Lakes metapopulation. Recent surveys reported 2445 wolves in Minnesota, 323–339 wolves in Wisconsin, and 278 wolves in Michigan. *Id.* at ¶¶ 75, 83, 86–87. A few wolves have dispersed from the Western Great Lakes population to North Dakota, South Dakota, Illinois, and Missouri. 68 Fed.Reg. at 15,-814. FWS has determined that these dispersing wolves are unlikely to contribute to overall wolf recovery unless they return to a core recovery population and join or start a pack. *Id.* at 15,814–15.

In the northeastern United States ("Northeast"), FWS documented wolves of unknown origin in Vermont and Maine, but no known breeding populations. *Id.* at 15,814. In 2002, an "apparent wolf" was trapped in southern Quebec, twenty miles from the New Hampshire border. *Id.* at 15,814. FWS stated that there is suitable wolf habitat in New York and "expansive wolf habitat in Maine and New Hampshire," but substantial barriers, such as the St. Lawrence River, a highway, and dense human development, will hinder dispersal from Canada. *Id.*

In 1995 and 1996, FWS reintroduced wolves to the northern Rocky Mountains ("Northern Rockies"—parts of Montana, Idaho, and Wyoming) by importing Canadian wolves. These wolves form an "experimental population" under ESA section 10(j), which means they receive less protection than endangered status provides. *Id.* at 15,808, 16. U.S.C. § 1539(10)(j). This population has been successful, growing to 663 wolves by 2002. JSMF ¶ 93. Outside of the Northern Rockies area, FWS documented three wolves in eastern Oregon and one wolf in eastern Washington. 68 Fed.Reg. at 15,817. In addition, "[s]everal wolf family units have been reported in the North Cascades [of Washington state]," apparently dispersing from British Columbia. *Id.* FWS "anticipate[s] additional movement of wolves from the northern U.S. Rockies into western Washington and Oregon and into the Cascade Range." *Id.* Further, "habitat that could support wolves certainly exists in several areas" in the Western states. *Id.*

### B. Recovery Plans

FWS developed recovery plans for the Western Great Lakes and Northern Rockies wolf populations. The 1992 Revised Eastern Timber Wolf Recovery Plan required "at least two viable populations within the 48 conterminous United States satisfying the following conditions: 1) the Minnesota population must be stable or growing, and its continued survival be assured and, 2) a second population outside of Minnesota and Isle Royale must be reestablished, having at least 100 wolves in late winter if located within 100 miles of Minnesota wolf population, or having at least 200 wolves if located beyond that

---

**5.** From 1974 to 1976, FWS listed four subspecies of *Canis lupus* as endangered. To eliminate certain problems inherent in listing sub-species, FWS relisted the gray wolf at the species level in 1978. Joint Statement of Material Fact ¶ 11.

distance." JSFM ¶ 14, Administrative Record Document ("AR Doc.") 1198 at 22,-046, 22,066–68. At the time of publication of the Final Rule, the Western Great Lakes wolf population exceeded the numerical criteria for downlisting and delisting. JSMF ¶ 80.

FWS's 1987 Northern Rocky Mountain Recovery Plan recommended ten breeding pairs for three consecutive years in each of three distinct recovery areas for a total of 300 adult wolves. FWS's 1994 Environmental Impact Statement ("EIS") on the Reintroduction of Gray Wolves to Yellowstone National Park and Central Idaho stated that the goals of the 1987 Recovery Plan were "minimal." JSMF ¶ 61. To maintain long-term persistence in this region, the evaluation proposed a delisting goal of thirty wolf packs comprising three hundred wolves for three years. JSMF ¶ 61. The goal for reclassification from endangered to threatened was twenty packs with at least two hundred wolves. Fed.Reg. at 15,810. The Final Rule at issue in this case incorporated the recovery goals developed by the 1994 EIS. JSMF ¶ 63, 68; 68 Fed.Reg. at 15,810. The Northern Rockies wolf population has exceeded the reclassification goal since 1997. 68 Fed.Reg. at 15,810.

## C. The Final Rule

The wolf Final Rule creates three DPSs: Eastern, Western, and Southwestern. The Final Rule delists the gray wolf in 14 southeastern states based on "listing error" because that region was not part of the gray wolf's historical range.[6] Wolves in the Southwestern DPS retain their endangered status. In addition, the conservation status of the experimental populations in the Northern Rockies does not change. Plaintiffs challenge the downlist-ing of the gray wolf in the Eastern DPS (North Dakota, South Dakota, Nebraska, Kansas, Minnesota, Iowa, Missouri, Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, New York, New Jersey, Massachusetts, Connecticut, Rhode Island, Delaware, Vermont, New Hampshire and Maine) and the Western DPS (Washington, Oregon, California, Nevada; and parts of Idaho, Montana, Utah, and Colorado). 68 Fed.Reg. at 15,862.

## STANDING

Plaintiffs consist of 19 environmental organizations that seek to protect the gray wolf. An organization has standing to sue on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Regarding element (a), members have standing to sue in their own right if "they have suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical, . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir.2000) (quoting *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).

---

**6.** "Listing error" means the species was erroneously listed on the ESA. Because the gray wolf did not historically occupy the southeastern United States, it was error to list the gray wolf in that region. Plaintiffs do not challenge the delisting of the gray wolf in the southeast. The Final Rule does not affect the endangered status of the red wolf.

■ Non-governmental intervenor-defendants (NGID) claim that plaintiffs do not have standing to sue because none of the plaintiffs' members suffers an injury in fact. "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found.*, 230 F.3d at 1147. The affidavits submitted by the plaintiffs demonstrate that individual members have an aesthetic or recreational interest in observing wolves. The Final Rule downlists the gray wolf, which decreases the protection afforded to the wolf in the Eastern and Western DPSs by permitting "takes" under the 4(d) rules. The decreased protection impairs the members' ability to observe wolves, which is an injury in fact.[7] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

## STANDARDS OF REVIEW

Both sides move for summary judgment. Summary judgment is appropriate if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate where, as here, there are no material factual disputes, and the only challenge presented is legal.

■ The APA governs our review of agency action under the ESA. *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir.2003). Under the APA, the reviewing court must set aside agency actions that are " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed

to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)). "An agency must be reversed when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Nat'l Ass'n of Home Builders*, 340 F.3d at 841 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). A court, however, may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. 814; *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir.2001).

## DISCUSSION

### A. Significant Portion of the Wolf's Range.

**1. The Secretary's interpretation of the phrase "significant portion of its range" is entitled to deference if reasonable.**

A species is endangered when it is "in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6). Because the wolf is not in danger of extinction throughout all of its range, 68 Fed.Reg. at 15,806, the issue here is whether the wolf is in danger of extinction in a "significant portion of its range." The Secretary downlisted the wolf throughout the Eastern and Western

---

7. Plaintiffs challenge the Final Rule in its entirety. The plaintiffs do not need to estab-

lish injury for each area affected by the rule.

DPSs because she determined that the wolf was not in danger of extinction in any "significant portion of its range" within either DPS. *Id.* at 15,857. The Secretary's interpretation and application of this statutory phrase is at the root of this controversy.

The phrase "significant portion of its range" is ambiguous. *See Defenders of Wildlife v. Norton,* 258 F.3d 1136, 1141 (9th Cir.2001) *("Defenders").* The agency's interpretation of the phrase, therefore, is entitled to deference unless the interpretation is unreasonable. *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). When an agency's interpretation is reasonable, it must prevail, even if there is another interpretation that is consistent with the statute. *Hawaii ex. rel. Atty. Gen. v. Federal Emergency Management Agency,* 294 F.3d 1152, 1159 (9th Cir.2002).

Plaintiffs contend that the gray wolf remains endangered throughout a "significant portion of its range" because the wolf is absent or very rare across much of its historical range, including large areas of suitable habitat. Plaintiffs argue that FWS violated the ESA by downlisting the wolf throughout the Eastern and Western DPSs—a 30 state area—when only the two core areas (Western Great Lakes and Northern Rockies) have made any progress toward recovery. To achieve the downlist, plaintiffs argue, FWS assessed the threats to the wolf in the core areas only, thereby failing to assess threats across a large geographic area, but downlisting all areas nonetheless.

The Final Rule makes clear that FWS limited its assessment of threats to the wolf's current range. 68 Fed.Reg. at 15,-857 ("We emphasize that our determinations are based on the current status of, and threats faced by, the existing wolf populations within these DPSs."). As used throughout the Final Rule and this opin-ion, "current range" means the wolf populations in the Western Great Lakes (parts of Minnesota, Wisconsin, and Michigan), and the Northern Rockies (parts of Montana, Idaho, and Wyoming), even though there are some wolves that live outside of the "current range."

The parties disagree on the reason why FWS did not assess the threats to the wolf beyond the current range. Plaintiffs contend that FWS never determined which portions of the wolfs range are significant. Instead, plaintiffs argue, FWS unlawfully assumed that only the core areas constitute a significant portion of the wolf's range. The Secretary responds that FWS specifically considered what constitutes a significant portion of the wolf's range. The Secretary points to the FWS meeting at Marymount University in November of 2000, at which FWS discussed the meaning of the phrase "significant portion of its range" in the context of the gray wolf. At Marymount, FWS defined the significant portion of the gray wolf's range as "that area that is important or necessary for maintaining a viable, self-sustaining, and evolving representative population or populations in order for the taxon to persist into the foreseeable future." AR Doc. 663 at 9924. The Secretary contends that FWS applied this definition and concluded, "the presence or absence of gray wolves outside of core recovery areas is not likely to have a bearing on the long-term viability of the three wolf populations . . . ." 68 Fed.Reg. at 15,825. The Secretary contends that the areas outside of the core areas are not significant portions of the wolf's range.

Plaintiffs argue that the Marymount definition deserves no deference because FWS did not explicitly consider what constitutes a significant portion of the wolf's range until after the Proposed Rule, 65 Fed.Reg. 43,450 (July 13, 2000), was pub-

lished. In addition, the Final Rule did not contain the Marymount definition, or any substantial analysis of population viability. Therefore, plaintiffs argue, the Secretary's reliance on the Marymount definition is a post-hoc litigation position.

The court agrees with the plaintiffs that the Final Rule does not thoroughly discuss what constitutes a significant portion of the wolf's range. In fact, the Final Rule is internally inconsistent. The "Conclusion" section of the Final Rule states, "we believe that when an endangered species has recovered to the point where it is no longer in danger of extinction throughout all or a significant portion of its *current* range, it is appropriate to downlist the listed species to threatened even if a substantial amount of the historical range remains unoccupied." *Id.* at 15,857 (emphasis added). This suggests that FWS simply relied on the current range of the wolf to justify the downlisting, instead of determining which areas are significant. However, the Final Rule also contains some discussion of the wolf's long-term viability, which suggests that the FWS applied the Marymount definition to the Final Rule. *See e.g.,* 68 Fed. Reg. at 15,809, 15,824. Therefore, despite the Final Rule's inconsistency, I base this decision on the Secretary's interpretation of "significant portion of its range" that is articulated in the Marymount definition and referred to, albeit obliquely, in the Final Rule. The Secretary's interpretation is entitled to deference if it is reasonable.

## 2. Arguments

Plaintiffs contend that even if the FWS did employ the Marymount definition in the Final Rule, the definition is not reasonable in the context of the ESA. Plaintiffs argue that FWS determined which areas were significant portions of the wolf's range solely in terms of the wolf's survival as a species. Plaintiffs argue that there is no difference between the danger of extinction throughout "all" and "a significant portion" of a species' range if "a significant portion of its range" is defined only in terms of the survival of the species. Under FWS's interpretation, the phrase "significant portion" is redundant.

Plaintiffs contend that FWS's interpretation is contrary to the Ninth Circuit's interpretation of the statutory phrase "significant portion of its range" in *Defenders.* 258 F.3d at 1140–47. In that case, FWS declined to list the flat-tailed horned lizard under the ESA because, among other reasons, suitable habitat on public land ensured the lizard's viability, despite threats on private land. The plaintiffs in *Defenders* argued that the lizard's private land habitat constituted a "significant portion of its range" and its survival on private land was in jeopardy. *Defenders,* 258 F.3d at 1141. The court ruled for the plaintiffs, stating, "a species can be extinct 'throughout ... a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." *Id.* at 1145; *see also Nat'l Ass'n of Home Builders,* 340 F.3d at 849 (applying the *Defenders* test for the analogous question of whether the loss of the Arizona pygmy-owl population would create a significant gap in its range). The *Defenders* court rejected the Secretary's argument that a species is endangered only if it "faces threats in enough key portions of its range that the *entire species* is in danger of extinction." *Id.* at 1141 (emphasis in original). The *Defenders* holding makes clear, plaintiffs argue, that the Secretary cannot downlist major geographical areas because core populations ensure the viability of the species as a whole.

Plaintiffs also cite a case that applied the *Defenders* test for "significant portion of its range," and held that FWS's decision to list the lynx as threatened, instead of endangered, was arbitrary and capricious. *Defenders of Wildlife v. Norton,* 239

F.Supp.2d 9 (D.D.C.2002) (*"Defenders (Lynx)"*) (remedy vacated on other grounds by *Defenders of Wildlife v. Norton,* 89 Fed.Appx. 273, 2004 WL 438590 (D.C.Cir.2004)). The lynx has a current population in the Northern Rockies. It was extirpated from three other regions with suitable habitat. In the lynx Final Rule, FWS stated, " '[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS,' " and " 'do[ ] not contribute substantially to the persistence of the contiguous United States DPS.' " *Defenders (Lynx),* 239 F.Supp.2d at 16–17 (quoting 65 Fed.Reg. 16052 (March 24, 2000)). The court applied the *Defenders* interpretation of "significant portion of its range" to determine that the three regions of suitable habitat outside the Northern Rockies constitute a significant portion of the lynx's range because these are "major geographical areas in which [the lynx] is no longer viable but once was." *Id.* at 20 (quoting *Defenders,* 258 F.3d at 1145). FWS's focus on the Northern Rockies population to the exclusion of three-quarters of the lynx's historical range was "arbitrary, capricious, and contrary to the ESA and its sweeping purpose." *Id.* at 21.

Further, plaintiffs contend that the legislative history of the ESA demonstrates that Congress intended to pursue recovery beyond the current range. Plaintiffs point to the House Report that contrasted the ESA with weaker predecessor statutes, which required listing a species as endangered only when the entire species was in danger of extinction. H.R.Rep. No. 412, 93rd Cong., 1 Sess. (1973). "The new definition's expansion to include species in danger of extinction 'in *any* portion of its range' represented 'a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction.' " *Defenders,* 258 F.3d at 1144 (quoting H.R.Rep. No. 412, 93rd Cong., 1 Sess. (1973) (emphasis in original)). The legislative history, plaintiffs contend, demonstrates that Congress intended FWS to contemplate the status of a species across a significant portion of its range, not just the status of the species as a whole. *See Defenders,* 258 F.3d at 1145 (explaining that Congress sought to provide FWS flexibility to list one population as endangered, even though a different population is thriving).

Plaintiffs argue that the Northeast and the Pacific Northwest are prime examples of significant portions of the wolf's range where FWS did not assess the threats to the wolf. Plaintiffs contend that FWS acknowledged the significance of the Northeast when it listed that area as a separate DPS in the Proposed Rule and concluded there would be "extensive and significant gaps" in the wolf's range without a wolf population in the Northeast. 65 Fed.Reg. 43,450, 43,473. Plaintiffs also argue that there was scientific consensus regarding the significance of the Northeast population because all peer reviewers who addressed the issue supported a Northeastern DPS. The support is due, in part, to the large amount of suitable habitat and the genetic diversity the Northeast wolf brings to the species. *Id.* The plaintiffs also argue that the Pacific Northwest is significant because FWS acknowledged there are suitable habitat and prey conditions, and a struggling wolf population. FWS also acknowledged that other areas, including the southern Rockies, contain significant habitat and prey resources. 68 Fed.Reg. at 15,817.

The Secretary contends that the term "significant portion of its range" is undefined and FWS's decision to downlist deserves deference. The Secretary argues that FWS's interpretation of "significant portion of [the wolf's] range" is firmly

grounded in the principles of conservation biology. Because FWS considered which areas are necessary for the viability of the gray wolf species, the Secretary contends, FWS did not limit the scope of its inquiry into "significant portion of its range" to the current range.

The Secretary alleges that the court ruled against FWS in *Defenders* because of FWS's procedural failure to consider whether private lands were a significant portion of the lizard's range. The Secretary argues that FWS adequately explained its reason for limiting the range. Specifically, FWS considered areas outside of the current range, but concluded that those areas are not significant to the species as a whole. "Once the agency determined that those areas did not constitute a significant portion of the gray wolf's range, it had no obligation separately to assess the five ESA § 4(a)(1) factors in those non significant areas." Federal Defendant's Response Brief at 23.

**3. The Secretary's interpretation is not reasonable because it is contrary to the Act and Ninth Circuit precedent.**

■ In the wolf Final Rule, the Secretary concludes that the current range of the wolf, *i.e.* the Western Great Lakes and the Northern Rockies, is the only significant portion of the wolf's range. 68 Fed. Reg. at 15,857 ("We emphasize that our determinations are based on the current status of, and threats faced by, the existing wolf populations within these DPSs."). This interpretation is not consistent with the *Defenders* interpretation that "a species can be extinct throughout a significant portion of its range if there are major

geographical areas in which it is no longer viable but once was." *Defenders*, 258 F.3d at 1145. There are major geographic areas outside of the Western Great Lakes and Northern Rockies where the wolf was once viable. FWS recognizes "expansive" habitat in Maine and New Hampshire and suitable, but isolated, habitat in New York. 68 Fed.Reg. at 15,814. FWS documented an increasing number of wolves dispersing to North Dakota and South Dakota. *Id.* The Pacific Northwest contains "suitable habitat and prey conditions." *Id.* at 15,817. Indeed, wolves may currently live in the North Cascades in Washington and FWS "anticipates additional movement ... into western Washington and Oregon and into the Cascade Range."[8] *Id.* Overall, FWS's own Final Rule makes clear that "there are major geographical areas in which [the wolf] is no longer viable but once was." *Defenders*, 258 F.3d at 1145.

*Defenders* recognized that the Secretary has a "wide degree of discretion in delineating 'a significant portion of its range,' since the term is not defined in the statute" but the Secretary "must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Id.* Regarding the Eastern DPS, FWS explained, "the progress towards recovery ... *within the western Great Lakes States* demonstrates that the species is not in danger of extinction in any significant portion of its entire range within the DPS. We therefore conclude that gray wolves are no longer properly classified as endangered species in the Eastern DPS." 68 Fed.Reg. at 15,810 (emphasis added). According to the Final Rule, the viability of one population

---

**8.** The decision to downlist the wolf in the Pacific Northwest without first assessing the threats to the wolf exemplifies FWS's violation of the ESA. The Pacific Northwest contains major geographical areas in which the wolf is no longer viable but once was, suitable habitat to which wolves have dispersed, and

threats that demonstrate the wolf is in danger of extinction (*e.g.*, of the three wolves that dispersed to Oregon from Idaho since 1999, the first was captured and returned to Idaho, the second killed by a vehicle, the third illegally shot). 68 Fed.Reg. at 15,817.

ensures the wolf is not in danger of extinction in any other portion of its range in the Eastern DPS. The viability of one population, therefore, renders all areas outside the Western Great Lakes region insignificant.

Regarding the Western DPS, FWS stated, "[t]he gray wolf's substantial success in meeting the revised recovery criteria for the Northern Rocky Mountains area ensures the wolf's long-term survival within its range in the Western DPS (*i.e.*, the area inhabited by the metapopulation of gray wolves in the Northern Rocky Mountains)." *Id.* at 15810–11 (parenthetical in original). Therefore, FWS concluded, "that the wolf is not in danger of extinction within any significant portion of its range in the [Western] DPS." *Id.* at 15,811. Again, the Secretary makes clear that the long-term viability of the Northern Rockies population renders all other areas in the Western DPS insignificant.

The Secretary's conclusion that the viability of two core populations in the Eastern and Western DPSs makes all other portions of the wolf's historical or current range insignificant and unworthy of stringent protection is contrary to Ninth Circuit precedent and the ESA. In *Defenders*, the Ninth Circuit rejected the Secretary's argument that because the short-tailed lizard's public land habitat ensured viability of the species, the private land habitat was not a significant portion of the lizard's range. 258 F.3d at 1142. In the wolf Final Rule, the Secretary argues that because the core population in the Western Great Lakes ensures viability throughout the Eastern DPS, all other areas (analogous to private land in *Defenders* ) are not significant portions of the wolf's range. 68 Fed Reg. at 15,810. The Secretary makes the same conclusion in the Western DPS.

*Id.* at 15,810–11. By ruling out all other portions of the wolf's range because a core population ensures the viability of a DPS, the Secretary's interpretation "has the effect of rendering the phrase [significant portion of its range] superfluous." *Defenders*, 258 F.3d at 1142. Thus, although the Secretary explained her justification for not considering threats to large areas of suitable habitat, the explanation is unreasonable.

Further, the Secretary's interpretation runs counter to Congressional intent. The House Report to the current version of the ESA recognized that the inclusion of the phrase "significant portion of its range" represents a "significant shift." *Id.* at 1144 (quoting H.R.Rep. No. 412, 93rd Cong., 1 Sess. (1973)). The Secretary's interpretation that "significant portion of its range" is limited to those areas that ensure viability within the DPS ignores the statutory modification to protect species in *"any* portion of its range." *Id.* (quoting H.R.Rep. No. 412, 93rd Cong., 1 Sess. (1973)) (emphasis in original).

*Defenders (Lynx)* provides additional support that the wolf Final Rule violates the Ninth Circuit's interpretation of "significant portion of its range." 239 F.Supp.2d at 20. In the lynx Final Rule, FWS decided that the Northeast, Great Lakes, and Southern Rockies were not a significant portion of the lynx's range because these areas did not "contribute substantially to the persistence of the contiguous U.S. DPS." *Id.* at 17. By excluding all areas that did not contribute to the persistence of the DPS, FWS limited "significant portion of its range" to areas that contribute to the persistence of the DPS. The court analyzed FWS's interpretation with the standard set forth by the Ninth Circuit.[9] *Id.* at 20. The court concluded, "the

9. The court described the standard as follows. "In a comprehensive opinion examining the phrase 'significant portion of its range' and

the legislative history, the Court of Appeals concluded that a species could be 'extinct throughout a significant portion of its range if

Service's focus on only one region of the Lynx's population—the Northern Rockies/Cascades—to the exclusion of the remaining three-quarters of the Lynx's historical regions, is antithetical to the ESA's broad purpose to protect endangered and threatened species." *Id.* at 19. In addition, FWS's conclusion was "counterintuitive and contrary to the plain meaning of the ESA phrase 'significant portion of its range.' " *Id.* at 19.

Similar to the lynx Final Rule, the wolf Final Rule limited the phrase "significant portion of its range" to areas that ensure the viability of the DPS. The wolf Final Rule stated, "[t]he presence or absence of gray wolves outside of core recovery areas is not likely to have a bearing on the long-term viability of the three wolf populations ... and therefore such presence or absence will not be a factor in our consideration of delisting each DPS." 68 Fed.Reg. at 15,825. The Secretary, once again, defined "significant portion of its range" as the areas that ensure viability within the DPS. Like *Defenders* and *Defenders (Lynx)*, this court must reject that interpretation.[10]

### B. Distinct Population Segments.

■ Because the statutory phrase "distinct population segment" was unclear, FWS created the DPS Policy in 1996 to guide the agency in recognizing DPSs that satisfy the definition of "species" under the Act.[11] 68 Fed.Reg. at 15807. The court generally must defer to an agency's interpretation of its own regulations. *Friends of the Cowlitz and CPR–Fish v. FERC,* 253 F.3d 1161, 1166 (9th Cir.2001). "[A]n

agency's interpretation of its regulations is controlling if not plainly erroneous or inconsistent with the regulation[s]." *Norfolk Energy, Inc. v. Hodel,* 898 F.2d 1435, 1439 (9th Cir.1990). However, "a court need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the wording of the regulation or inconsistent with the statute under which the regulations were promulgated." *Mines v. Sullivan,* 981 F.2d 1068, 1070 (9th Cir.1992).

The DPS Policy provides FWS the flexibility to list, downlist, or delist discrete and significant populations, even though the conservation status of the species may differ · elsewhere, 61 Fed.Reg. 4722; *see also,* Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 842 (9th Cir.2003). For example, if a distinct and significant population of an unlisted species is struggling while other populations are faring well, FWS may designate the struggling population as a DPS and list it as endangered. Likewise, FWS can downlist a DPS if that discrete and significant population is no longer endangered. The DPS Policy "allows the Services to protect and conserve species ... before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61 Fed.Reg. at 4725. The ESA and the DPS Policy require FWS to base decisions to list or downlist a DPS on the statutorily prescribed listing factors in ESA section 4(a)(1), 16 U.S.C. § 1533(a)(1). 61 Fed.Reg. at 4725.

there are major geographical areas in which it is no longer viable but once was.' " *Defenders of Wildlife v. Norton,* 239 F. Supp 2d 9, 20 (D.D.C.2002) (quoting *Defenders of Wildlife v. Norton,* .258 F.3d 1136, 1145 (9th Cir.2001)).

10. At oral argument, several defendants stressed that the ESA is a recovery statute, not a restoration statute. This opinion only

concerns recovery of the gray wolf across a significant portion of its range. This opinion does not contemplate restoration of the gray wolf.

11. Plaintiffs do not challenge the validity of the DPS Policy, 61 Fed.Reg. 4722 (Feb. 7, 1996), only FWS's application of the Policy in this case.

## 1.  Arguments.

Plaintiffs argue that FWS misapplied the DPS Policy by creating three large DPSs that incorporate the entire area covered by the former species-level listing. Plaintiffs argue that FWS "stands the DPS Policy on its head" by downlisting the vast Eastern and Western DPSs because wolves are recovering in the core populations. Further, FWS violated ESA section 4(a)(1), 16 U.S.C. § 1533(a)(1), because it failed to assess the threats (*i.e.* apply the listing factors) to any areas outside of the core recovery areas.

Plaintiffs contend that the DPSs in the Final Rule do not reflect sound biological principles and are not consistent with the conservation interest of the DPS Policy or the ESA. 61 Fed.Reg. at 4722, 4724. In addition, plaintiffs point to comments by FWS employees that suggest the DPSs were designed to downlist and then delist as large an area as possible. For example, regarding a suggestion that FWS designate the Northern Rockies core area a DPS, a coauthor of the Final Rule stated, "a three-state Northern Rockies DPS leaves the rest of the West not delistable unless we establish additional recovered populations in the areas outside the DPS." AR Doc. 908 at 11,467. The desire to delist "the rest of the West," is not an appropriate consideration. In addition, a co-author of the Final Rule stated, "I think this [reclassification] is the best and quickest way to get the policy and legal framework greased for delisting." AR Doc. 974 at 15,316. Plaintiffs contend that FWS relied on factors beyond scientific data.

The Secretary argues that the DPSs are based on sound biology. Each DPS encompasses a gray wolf recovery population, its recovery areas, the locations of all documented dispersers, the most likely locations of future dispersers, and a wide buffer between the core area and the boundary of the DPS to ensure that it is markedly separate from other DPSs. The Secretary contends that the DPSs satisfy the "discrete" and "significant" factors of the DPS Policy. The Final Rule explains that each DPS is discrete because the current wolf populations are separated by large areas that are not occupied by breeding populations. 68 Fed.Reg. at 15,819. Each DPS is significant because loss of the population in any DPS would "clearly produce huge gaps in the current gray wolf distribution in the 48 States." *Id.*

The Secretary contends that FWS cannot create a DPS unless there is a verified population. Because there was not a wolf population in the Northeast, the Pacific Northwest, or the Southern Rockies, for example, FWS could not create DPSs in those areas. The Secretary also contends that when subdividing a listed species into DPSs, the entire previously listed range must be included in the resulting DPSs. The Secretary argues that FWS cannot create "non-DPS remnant" endangered areas outside of the DPSs. Therefore, the Service included the entire previously listed area (outside of the Southeast) into one of the three DPSs. The Service argues that its interpretation of its DPS Policy deserves the highest level of judicial deference.

## 2.  The Secretary's application of the DPS Policy is inconsistent with the DPS Policy and the ESA.

The DPS Policy is designed to draw a line around a population whose conservation status differs from other populations within that species. *See Nat'l Ass'n of Home Builders*, 340 F.3d at 842. The application of the DPS Policy in the wolf Final Rule inverts this purpose. FWS recognized distinct populations in the Southwest, Western Great Lakes and Northern Rockies. The Western Great Lakes and Northern Rockies populations

achieved the recovery goals, while all other populations, such as the Northeast and the Pacific Northwest, are tenuous or nonexistent. Instead of drawing a line around the distinct populations in the Western Great Lakes and the Northern Rockies, FWS extended the boundaries from these core areas to encompass the wolf's entire historical range. As a result, the conservation status of populations within each DPS varies dramatically, ranging from recovered populations in parts of Montana, to precarious populations in Washington, to extirpated populations in Nevada, for example. This inversion of the DPS Policy, which FWS used to downlist large geographic areas, is inconsistent with the DPS Policy.

This court found FWS's decision to list the bull trout in five river systems (each a DPS) arbitrary and capricious after FWS had previously found the species endangered throughout its range. *Friends of Wild Swan v. U.S. Fish & Wildlife Service*, 12 F.Supp.2d 1121 (D.Or.1997). In a 1994 finding, FWS determined that listing the bull trout as an endangered species throughout the conterminous United States was warranted, but precluded. *Id.* at 1133. In 1997, FWS proposed to list the bull trout in five DPSs, instead of the conterminous United States. *Id.* The court recognized that the creation of the DPSs narrowed the range of bull trout protection, even though the threats to the bull trout had not changed. *Id.* The court stated, "[l]isting of population segments is a proactive measure to *prevent* the need for listing a species over a larger range— *not* a tactic for subdividing a larger population the FWS has already determined ... warrants listing throughout a larger range." *Id.* (emphasis in original).

Similar to the bull trout case, the wolf Final Rule created DPSs that decreased the protection afforded to the species, even though the population status of the wolf was not improved outside of the core recovery areas. For example, wolves in Washington receive less protection under the Final Rule, even though nothing has changed in that area to justify less protection. Like the bull trout DPS, the wolf DPS appears to be a tactic for downlisting areas the FWS has already determined warrants listing, despite the unabated threats and low to nonexistent populations outside of the core areas.

3. **The improper DPSs allowed FWS to downlist vast areas without applying the listing factors, in violation of the ESA and the DPS Policy.**

The Secretary contends that a wolf population must exist for FWS to designate a DPS. 68 Fed.Reg. at 15,819. Therefore, the Secretary could only create a DPS for each recovery area. Further, all areas previously listed as endangered must be part of a DPS.[12] In this case, the Secretary's interpretation of the DPS Policy clouds the ultimate requirement of analyzing threats pursuant to the listing factors. The ESA makes clear that a species shall retain its endangered status unless the Secretary, by application of the listing factors, demonstrates that downlisting is appropriate. 16 U.S.C. § 1533(a)(1).

The Secretary did not apply the downlisting factors outside the core areas, but downlisted nonetheless. The Final Rule provides, "[b]ecause a separate DPS cannot be designated in the Northeast due to a lack of evidence of an extant wolf population, *this area is being combined with the* proposed Western Great Lakes DPS and

12. The Secretary does not cite any authority in the ESA or regulations for these conclu-

·sions.

with other States, and is being designated as part of the Eastern Gray Wolf DPS." 68 Fed.Reg. at 15,819 (emphasis added). In this way, the proposed Western Great Lakes DPS grew to incorporate the Northeastern States. By joining the Northeastern states with the recovered population in the Western Great Lakes states, the Secretary downlisted an area from North Dakota to Maine based on the analysis of threats in parts of three states, Minnesota, Wisconsin, and Michigan. *Id.* at 15,811. The Secretary projected the success in Minnesota, for example, to a completely unrelated set of circumstances in Maine. Likewise, the Western DPS grew to incorporate, and downlist, all areas outside of the three-state Northern Rockies core. 68 Fed.Reg. at 15,810–11.

■ FWS downlisted the entire Eastern and Western DPSs without analyzing the threats to the gray wolf outside of the core areas, as required by ESA section 4(a)(1), 16 U.S.C. § 1533(a)(1). 68 Fed.Reg. at 15,857. Thus, the Secretary's application of the DPS policy is "inconsistent with the statute under which the regulations were promulgated." *Mines v. Sullivan,* 981 F.2d 1068, 1070 (9th Cir.1992). FWS cannot interpret its DPS Policy in such a way as to avoid the clear statutory mandate that "the Secretary shall ... determine whether any species is an endangered species or threatened species because of [the listing factors]." 16 U.S.C. § 1533(a)(1).

The DPSs in the Final Rule grew even larger and less biologically relevant when FWS "expanded the boundaries" of the proposed DPSs to include all states that the Proposed Rule delisted. The Proposed Rule delisted fourteen states that were outside the boundaries of the four proposed DPSs. The Final Rule explains why the FWS could not delist these states, but decided to downlist the states instead:

> [B]ecause restoration of gray wolves in these areas [outside the four proposed

DPSs] is unnecessary, and because we have no plans to restore gray wolves in those areas, there was no reason to maintain the Act's protection for any gray wolves that might turn up there.... However, further analysis ... led to our conclusion that the Act does not provide for delisting a species in parts of its listed historical range because restoration of wolves in these areas is unnecessary.... Therefore, we have modified those portions of our proposal that would have delisted the gray wolf in any part of its historical range. This was done [in the Final Rule] *by expanding the boundaries of the remaining gray wolf DPSs* so they now include all States within the historical range of the gray wolf.

68 Fed.Reg. at 15,826 (emphasis added).

"Expanding the boundaries" of the DPSs has the effect of downlisting large regions without considering the listing factors. The decision to expand the boundaries of the DPSs (*i.e.* downlist) because FWS realized it could not delist these regions is arbitrary and capricious. This decision is not based on the present or future threats to the wolf or on the best available science. Furthermore, the action violates the DPS policy because the expanded DPS boundaries are not supported by sound biological principles, as required by FWS's DPS Policy. 61 Fed.Reg. at 4722.

To summarize, FWS created three large DPSs, and downlisted the Eastern and Western DPSs based on the success of the core recovery areas. The Final Rule is arbitrary and capricious because FWS downlisted major geographic areas without assessing the threats to the wolf by applying the statutorily mandated listing factors. FWS's interpretation of its regulations cannot preclude a statutory mandate.

At oral argument, the defendants stressed that the Final Rule only downlisted the wolf; therefore, the wolf retains protection under the ESA. Despite defendants' assurances, a threatened species receives substantially less protection than an endangered species. Downlisting the wolf allowed FWS to implement 4(d) rules that permit "takes" under certain circumstances. *See* 68 Fed.Reg. at 15,863–68. In addition, defendants argued, without citing any authority, that downlisting decisions deserve greater deference than listing decisions. The court recognizes FWS's expertise in wolf management and does not question FWS's science. However, the Secretary's interpretation that a "significant portion of [the wolf's] range" is limited to the core areas that ensure long-term viability is contrary to the ESA and Ninth Circuit precedent. As a result of the Secretary's interpretation, the Secretary did not consider the threats to the wolf outside of the core areas. FWS regulations are explicit that the agency apply the "listing factors" to determine whether a species "shall be listed or reclassified." 50 C.F.R. § 424.11(c).

Because this opinion vacates the DPSs in the Final Rule, it does not rule on the northern boundary of the Southwestern DPS. In addition, the court does not decide whether FWS could downlist the Western Great Lakes and Northern Rockies core populations at this time. Further, the question of whether FWS should have created a Northeastern DPS is no longer an active issue because the Final Rule is vacated.

## C. Conservation Programs

Plaintiffs contend that the Secretary has abandoned her affirmative conservation duty under ESA section 7(a)(1), 16 U.S.C. § 1536(a)(1). Section 7(a)(1) provides:

"The Secretary shall review other programs administered by [her] and utilize such programs in furtherance of the purposes of the Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authority for the conservation of endangered species and threatened species...." 16 U.S.C. § 1536(a)(1). The ESA defines conservation as, "to use and the use of all methods and procedures which are necessary to bring an endangered species or threatened species to the point at which the measures pursuant to this chapter are no longer necessary." *Id.* at § 1532(3).

Plaintiffs argue that the Secretary is not using all methods necessary to conserve the wolf. In addition, plaintiffs argue that the Secretary has a duty to restore the wolf to all significant portions of its range.

## 1. Section 7(a)(1) applies to the FWS.

█ The Secretary contends that section 7(a)(1) does not apply to FWS because the agency's implementation and administration of the ESA is a program, in and of itself, designed to effectuate the conservation of endangered and threatened species. The ESA's reference to "other programs" and "all other federal agencies" in section 7(a)(1), the Secretary argues, excludes FWS. This argument fails. The exclusion of FWS from section 7(a)(1) conservation duties conflicts with ESA section 2(c)(1), which provides: "[i]t is further declared to be the policy of Congress that *all Federal departments and agencies* shall seek to conserve endangered species and threatened species." *Id.* at § 1531(c)(1) (emphasis added). "[S]ections 2(c)(1) and 7(a)(1) can be read consistently and without conflict...."[13] *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 898 F.2d 1410,

---

13. In *Pyramid Lake Paiute Tribe*, 898 F.2d 1410 (9th Cir.1990), the U.S. Navy argued, but the court rejected, that the Navy had a lesser conservation duty than agencies within the Department of the Interior.

1416–17 n. 15 (9th Cir.1990). "In interpreting language in one section of a statute in conjunction with language of other sections, this court strives to find a reading that is consistent with the purposes of the entire statute considered as a whole." *Id.* Exempting FWS from the duty to utilize its conservation authority is inconsistent with the Act. In addition, this court did not find, and the Secretary did not cite, any cases that suggest section 7(a)(1) does not apply to FWS.

### 2. FWS's conservation program satisfies Section 7(a)(1).

■■■■ Agencies have an "affirmative obligation[ ] to conserve under section 7(a)(1)." *Pyramid Lake Paiute Tribe,* 898 F.2d at 1416–1417. An agency has a specific, not generalized, duty to conserve species. *See Sierra Club v. Glickman,* 156 F.3d 606, 615–616 (5th Cir.1998). Section 7(a)(1) provides a mandatory duty to conserve, but the statute does not require particular conservation action. While compliance is not committed to agency discretion by law, "it is clearly beyond [a] court's authority to order that any specific conservation measure to be undertaken." *Water-Watch of Oregon v. United States Army Corps of Engineers,* 2000 WL 1100059 at *11 (D.Or.2000).

■■■■ The Secretary has implemented specific and concrete conservation and recovery programs for the gray wolf, including reintroduction of the gray wolf in the Northern Rockies. The Final Rule, therefore, provides a conservation program for the gray wolf. The Secretary's interpretation of section 7(a)(1) deserves deference. *Pyramid Lake Paiute Tribe,* 898 F.2d at 1418 (citing *Chevron U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. 2778). The FWS conservation program satisfies the agency's section 7(a)(1) conservation duty. This ruling regarding section 7(a)(1) does not affect the rest of the opinion.

### RELIEF

■■■■ The Final Rule is enjoined and vacated because it does not comply with the ESA and the DPS Policy. The Secretary asserts that a statutory violation does not always result in an injunction. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1178–79 (9th Cir.2002) (granting injunctive relief due to Service's failure to comply with ESA section 4 listing determination). Courts may deny injunctive relief in ESA cases if there is no likelihood of irreparable injury. *National Wildlife Federation v. Burlington Northern RR, Inc.,* 23 F.3d 1508, 1511 (9th Cir.1994) (preliminary injunction not warranted because there was no evidence of a reasonable likelihood of harm to grizzly bear from grain spills near railroad tracks). The Secretary argues that an injunction is not appropriate here because the impact on the gray wolf is modest.

Enjoining the Final Rule is necessary because the 4(d) rules in the Final Rule permit lethal and non-lethal harm to the gray wolf. The death or injury of endangered wolves due to the 4(d) rules is irreparable injury.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is GRANTED. Defendants' motions for summary judgment are DENIED. As such, the Final Rule is enjoined and vacated.